**Judd ALEXANDER and Richard Edwards, on behalf of themselves and as representatives of a class of persons similarly situated, Plaintiffs,**

v.

**PRIMERICA HOLDINGS, INC., formerly known as Primerica Corporation, The Board of Directors of Primerica Holdings, Inc., James Dimon, Irwin Ettinger, John Fowler, John Doe 1–10 (being individual members of the Primerica Holdings, Inc. Board of Directors), and ABC (being the administrator of the American Can Salaried Retiree Group Insurance Plan), Defendants.**

No. Civ. A. No. 89–5151 (AJL).

United States District Court, D. New Jersey.

Jan. 7, 1993.

---

Michael R. Cole, Robert D. Towey, Riker, Danzig, Scherer, Hyland & Perretti, Morristown, NJ, for plaintiffs.

Saul P. Morgenstern, Dewey Ballantine, New York City and Donald A. Robinson, Robinson, St. John & Wayne, Newark, NJ, for defendants.

## OPINION

LECHNER, District Judge.

This is a class action brought by plaintiffs Judd Alexander and Richard Edwards on behalf of themselves and persons similarly situated (collectively, the "Plaintiffs") against defendants Primerica Holdings, Inc. ("Primerica"), the Board of Directors of Primerica (the "Board of Directors"), James Dimon ("Dimon"), Irwin Ettinger ("Ettinger"), John Fowler ("Fowler") and ABC (the "ABC") (collectively, the "Defendants").[1] Plaintiffs brought suit to declare and enforce their rights to medical insurance benefits, life insurance benefits and survivor income benefits under a retirement welfare benefit plan (the "Plan") established by the American Can Company ("American Can"), a predecessor of Primerica. Plaintiffs claim Defendants have violated the provisions of the Employee Retirement Income Security Act of 1974

---

1. The ABC appears to be an arbitrary designation for whatever Plaintiffs contend is the administrative body for the American Can Salaried Retiree Group Insurance Plan. Amended Complaint, ¶ 9.

("ERISA"), 29 U.S.C. § 1001 *et seq.*, by modifying Plaintiffs' benefits Plan.

Plaintiffs' complaint was filed 14 December 1989. Plaintiffs' First Amended Class Action Complaint (the "Amended Complaint") was filed 9 January 1991. By consent order (the "Consent Order"), filed 13 May 1991, Plaintiffs' class was certified as consisting of:

> ... [A]ll salaried retirees of American Can and their spouses, and the spouses of all deceased former employees of American Can, excluding those salaried retirees (and their spouses or surviving spouses) who were designated by American Can, as retirees of its "Packaging Sector" in connection with the sale of the packaging operations of American Can to Triangle Industries.

Consent Order at 2.

Jurisdiction is specifically alleged in the Amended Complaint under section 502 of ERISA, 29 U.S.C. §§ 1132(a)(1)(B), 1132(a)(2) and 1132(a)(3)(A) & (B). Amended Complaint, ¶ 2. It is presumed jurisdiction is also alleged under 29 U.S.C. § 1132(e).[2]

Currently before the court is a motion by Plaintiffs for a preliminary injunction (the "Preliminary Injunction Motion") pursuant to Fed.R.Civ.P. 65. Prior to a ruling on the merits of the Preliminary Injunction Motion, the parties have jointly requested a decision on whether Plaintiffs would be required to post a bond and, if so, in what amount, if they were successful on the Preliminary Injunction Motion.[3] Plaintiffs Bond Brief at 4; Primerica Bond Brief at 5. For the reasons that follow, a bond would be required in the amount of $7,733,514 if Plaintiffs were successful on the Preliminary Injunction Motion.

*Facts*

**A. The Parties and the Plan**

Primerica is a corporation organized under the laws of the State of Delaware; it maintains its principal place of business in the State of Connecticut. Amended Complaint, ¶ 5. Dimon, Ettinger and Fowler are or were members of the Board of Directors of Primerica. *Id.*, ¶ 8. Primerica is the surviving entity of a merger between Primerica and Primerica Corporation in December 1988. *Id.*, ¶ 6. Primerica Corporation was organized under the laws of the State of New Jersey and, until April 1987, was known as American Can.[4] *Id.* Plaintiffs are either retired salaried employees of American Can or their surviving spouses. *Id.*, ¶¶ 3-4, 11.

Beginning in 1957, American Can maintained the Plan which is a retirement welfare benefits plan for qualified salaried employees who retired. *Id.*, ¶ 21. The terms of the Plan were set forth in a series of summary plan descriptions (the "SPDs") which, pursuant to ERISA, must be furnished to Plan beneficiaries. *See* 29 U.S.C. § 1022. The benefits under the Plan included a pension, life insurance and medical insurance. Amended Complaint, ¶ 21. It is uncontroverted that Plaintiffs are former salaried employees or their surviving spouses eligible to receive retirement benefits under the Plan. It is also uncontroverted Plaintiffs received benefits under the Plan. It is contested that, as Plaintiffs allege, "repeated representations were made to employees and retirees alike" that

---

2. Section 1132(e) provides, in pertinent part: (1) ... [T]he district courts of the United States shall have exclusive jurisdiction of civil actions under [ERISA] brought by ... a participant, beneficiary, or fiduciary....
29 U.S.C. § 1132(e)(1).

3. Because of the dispositive motion procedure, *see* General Rule 12 N, Appendix N, General Rules of the District court for the District of New Jersey, the Preliminary Injunction Motion is pending but no papers in support or in opposition to the motion have yet been presented directly to the court. Both parties, however, have submitted briefs on the issue of whether

Plaintiffs should be required to post a bond and, if so, for what amount, should they be successful of the Preliminary Injunction Motion. *See* Letter Memorandum of Plaintiffs (the "Plaintiffs Bond Brief"), dated 30 December 1992; Letter Brief of Primerica (the "Primerica Bond Brief"), date 30 December 1992.

4. Plaintiffs allege Primerica Corporation and then Primerica succeeded to all of American Can's obligations under the retirement benefit plans. *Id.*, ¶ 29. Defendants have disputed this allegation. *See* Answer to Amended Complaint, filed 13 February 1991, ¶ 6.

their retirement benefits would be provided by the company "for life."[5]  *Id.*, ¶ 22.

Plan beneficiaries are required to make mandatory monthly contributions to cover a portion of the cost of the Plan. Apparently, the amount of the monthly mandatory contributions Plan beneficiaries are required to make was, until 1 February 1989, $5.00 per covered Plan participant.[6]  *Id.*, ¶ 30. Plaintiffs allege Primerica's predecessor, American Can, had agreed the amount of those contributions would never increase. Plaintiffs allege American Can

> promised the [P]laintiffs by various means, including oral representations, publications, documents, brochures and a general course of dealing that it would provide [P]laintiffs with the protection and security of the American Can Retirement Program, including lifetime pension, life insurance and lifetime medical insurance benefits upon retirement and that the lifetime medical insurance benefits would be so provided *at a fixed, nominal cost to retirees.*

Amended Complaint, ¶ 23 (emphasis added). Plaintiffs further allege these benefits were "irrevocable upon retirement" and American Can could neither unilaterally terminate any of the benefits nor unilaterally increase the cost of the medical insurance coverage.[7]  *Id.*, ¶¶ 25–27.

Plaintiffs allege that American Can "at no time reserved to itself the right to unilaterally terminate" benefits under the Plan or increase the cost of those benefits. *Id.*, ¶ 26–27. The SPDs neither expressly prohibit nor expressly provide for the raising of the amounts of the mandatory con-

tributions. All but one SPD, however, contained the following provision:

> The Company expects to continue this Plan indefinitely, but necessarily reserves the right to amend, modify, or discontinue the Plan in the future in conformity with applicable legislation. . . .

Affidavit of Sal Giudice, dated 6 March 1991, Ex. A at 5.

In addition, it appears that most employees of American Can signed one of two forms upon registering for coverage under the Plan which indicate that the contribution amount for retirees was understood to be subject to change. Affidavit of Saul P. Morgenstern, dated 15 September 1993, Ex. A; *See* Letter from Harry Kurzweil, dated 8 October 1992 (the "8 Oct. 1992 Letter"), at 2–3.

The first form ("Form A"), is a one page form entitled "Deduction Authorization— Comprehensive Medical Plan Coverage For Retirees Receiving Benefits Under the American Can Company Plan For Salaried Employees." *See id.* Form A contained the following paragraph:

> *I understand that the monthly charge for this coverage is subject to change in the future.* If the cost of this coverage is changed, I will be notified in advance and given the option of continuing my coverage at the new monthly cost or terminating my coverage.
>
> I request and authorize you to direct Bankers Trust Company . . . to deduct from retirement payments I receive under the . . . Plan amounts equal to the coverage I have indicated above and to pay these amounts to American Can. . . . This authorization will continue to apply

---

**5.** Defendants deny that any " 'repeated representations' that the retirees' medical insurance benefits were 'for life' " were made. Defendants' Answers to Plaintiffs' Initial Set of Interrogatories (the "Primerica Inter. Ans."), No. 2.

**6.** It appears that other changes in the monthly contribution had preceded the February 1989 increase. These changes included: an increase in the contribution to the medical insurance paid by retirees from $0.85 per month to $1.70 per month in December 1985, another increase to $3.55 per month in July 1973, and a further increase to $5.00 per month in January 1984. Primerica Inter. Ans. No. 3.

**7.** In addition to the change in retiree contribution amounts, Primerica has documented a history of unilateral changes made in medical coverage under the Plan, *see* Primerica Inter. Ans. No. 3, in order to demonstrate that Primerica "at all times intended to reserve its right to amend, modify or discontinue the Plan" and that Defendants "had no fiduciary obligation to maintain the Plan or any other of Plaintiffs' welfare benefits, at specific levels or at specific costs." *Id.*, Nos. 10–11.

until canceled by me by written notice.... This authorization will not remain in effect *if American Can discontinues extending medical coverage* to me and/or to my eligible dependant.

*Id.* (emphasis added).

The second form ("Form B") is a shorter version of Form A entitled "Deduction Authorization Card for Retired Employees who are receiving benefits under the American Can Company Retirement Plan for Salaried Employees and who desire to obtain Major Medical Insurance Plan Coverage." *Id.* Form B contains the statement "I want [the] Major Medical Insurance Plan coverage indicated by my check mark." *Id.* Form B then offered the retiree three options to choose from: (a) "Retiree with spouse ($7.10 + $2.72 for each dependant child)," (b) "Retirees Only ($3.55 per month *initially*)" and (c) "Retiree with Spouse ($7.10 per month *initially*)." *Id.* (emphasis added). Form B also contained language similar to Form A:

I request and authorize you to direct Bankers Trust Company ... to deduct from retirement payments I receive under the ... Plan amounts equal to charges for such Major Medical Insurance Plan coverage and to pay over such amounts to American Can.... This request and authorization will continue to apply until canceled by me by written notice ... *notwithstanding any changes in benefits or charges or any cessation of my coverage* not communicated to you.

*Id.* (emphasis added).

On or about 9 January 1989, Primerica notified the Plan beneficiaries it was increasing the amount of monthly mandatory contributions Plan beneficiaries had to make to the group medical insurance plan. Amended Complaint, ¶ 30. The contributions were increased from the then current amount of $5.00 per covered individual per month to $50.00 per covered individual per month. *Id.* The increase went into effect on 1 February 1989. *Id.* The contributions were and are automatically deducted from each Plan beneficiary's monthly pension check unless Primerica was notified

the beneficiary intended to terminate his or her coverage. *Id.* Some members of the Plaintiffs' class apparently opted to terminate their coverage under the Plan rather than pay the higher costs. Subsequently, Plaintiffs commenced this suit against Defendants.

### B. *The Amended Complaint*

In Count One, Plaintiffs allege Primerica violated both ERISA and Federal common law and breached its contractual obligations under the group medical insurance plan by unilaterally increasing the amounts of the mandatory contributions to the group medical insurance plan. *Id.*, ¶¶ 32–38. In Count Two, Plaintiffs allege Primerica's unilateral increase in the amount of mandatory medical insurance plan contributions was unlawful and constituted a breach of contract. *Id.*, ¶¶ 30–44. Specifically, Plaintiffs allege the retirement benefits were vested and not subject to modification. *Id.* In Count Three, Plaintiffs allege Primerica, the Board of Directors, including Dimon, Ettinger and Fowler, and ABC breached their fiduciary duties under ERISA, Federal common law and the retirement benefits plans by unilaterally modifying the amount of mandatory medical insurance plan contributions. *Id.*, ¶¶ 45–51. In Count Four, Plaintiffs allege American Can, Primerica Corporation and Primerica failed to reserve properly their rights to modify unilaterally the retirement benefits plans. *Id.*, ¶¶ 52–54. Moreover, Plaintiffs allege that, if such a right was properly reserved, Defendants "failed to adequately convey such reservation to [P]laintiffs in clear and unambiguous terms ... calculated to be understood by the average plan participant." *Id.*, ¶ 53.

Plaintiffs seek a declaratory judgment that Primerica is obligated to maintain the same level of benefits upon the terms which existed prior to 1 February 1989 for the respective lifetimes of each member of the Plaintiffs' class. *Id.* at 10–11, 14, 17, 20. Plaintiffs also seek to restrain Primerica from changing the retirement benefits and to permit all Plaintiffs who terminated their coverage after 1 January 1989 to reinstate their coverage. *Id.* at 11, 14, 17, 20. Plaintiffs further seek compensatory and

punitive damages. *Id.* at 11–12, 14–15, 17–18, 20–21.

### C. Motion For Summary Judgment

On 25 July 1991, summary judgment was granted in favor of Primerica. *See* Letter–Opinion, filed 25 July 1991 (the "25 July 1991 Decision"), 47; Order, filed 25 July 1991, at 1–2. On appeal, the Circuit reversed and remanded the case. *See Alexander v. Primerica Holdings, Inc.*, 967 F.2d 90, 96 (3d Cir.1992). The Circuit concluded that the SPDs did not unambiguously set forth a reservation of the right by Primerica to reduce future benefits and that this ambiguity was a question of fact to be resolved at trial. *Id.* Thus, the case was remanded for "an interpretation of the [SPDs] in light of all relevant evidence and for the district court's further consideration of the retirees' claims." [8] *Id.* at 95. The Circuit explained:

> Because a Plan document does not exist and because the [SPDs] are ambiguous,[9] the district court, as the trier of fact, must determine whether the Plan provided lifetime benefits upon retirement.... In interpreting an ambiguous ERISA plan, a court may consider the intent of the plan's sponsor, the reasonable understanding of the beneficiaries, and past practice, among other things. In this regard, we note that the retirees' affidavits and documents, if believed by the district court, are sufficient to show that the Plan promised lifetime irreducible benefits.[10]

*Id.* at 96 (citations omitted).

### D. Subsequent Changes to the Plan

On 8 October 1992, Primerica notified the court and counsel for Plaintiffs that it intended to change again the benefits under the Plan. *See* 8 Oct. 1992 Letter at 5–6. The 8 Oct. 1992 Letter stated in pertinent part:

> As we mentioned at the conference on September 22, 1992, recent accounting rule changes will require Primerica to record as a liability the value of all retiree welfare benefits, including life insurance and medical insurance. This rule, known as FAS 106, takes effect no later than January 1, 1993....

> We have reviewed the evidence produced in discovery since remand and we are of the view that the record supports Primerica's position that the reservation of rights in the [SPDs] was intended to permit the Company to change the cost of benefits to retirees....

> Primerica does not believe it should be required to book the significant liability required by FAS 106—effectively acting as though it had lost the case—only because the litigation will not be resolved before the rule takes effect. Consequently, the Company will soon announce that, effective January 1, 1993, the members of the class will be offered, at full cost to the participants, several welfare plan options, including (1) the benefits plan under which they are presently covered, and (2) other group health and life insurance plans similar to those offered to all other Primerica retirees. *We are advising the Court, and plaintiffs' counsel, of this upcoming change, in order that plaintiffs may have the opportunity to raise any questions about this action well in advance of its effec-*

---

**8.** In granting summary judgment, the extrinsic evidence offered by Plaintiffs was not considered in determining the meaning and intent of the "reservation of rights" language. *See* 25 July 1991 Decision at 23–26.

**9.** In support of their cross-motions for summary judgment, the parties relied upon the SPDs as the operative expressions of the Plan, notwithstanding the fact that the SPDs are merely summaries of the Plan. *See* 25 July 1991 Decision at 5 n. 5. Because neither party submitted the Plan documents which set forth the details of the various forms of insurance and other bene-

fits under the Plan, the motions of the parties were decided on the basis of the SPDs.

Significantly, since the decision on the cross-motions for summary judgment and the decision on appeal were rendered, continued discovery revealed the existence of Plan documents, as well as Forms A and B signed by individual members of the Plaintiff class upon registering for benefits through Primerica.

**10.** The opinion of the Circuit and this comment in particular were drafted without the benefit of review of Forms A and B.

*tive date....*[11]

8 Oct. 1992 Letter at 5–6 (emphasis added).

On 26 October 1992, Primerica notified its retirees of the additional changes in benefits. *See* Letter from Kevin T. O'Reilly, dated 26 October 1992 (the "26 Oct. 1992 Letter"). The 26 Oct. 1992 Letter stated:

> With this letter, we are notifying you of an additional change in your rates; but, we are offering you some additional coverage choices as well.
>
> In 1993, Primerica will offer the following choice of coverage: 1) a newly designed program [(the "New Plan")] only for retirees and/or spouses over age 65 that has been designed to cost the same $50 per month as you are currently paying; 2) the programs currently offered to Primerica Corporate ... retirees, both over and under age 65 (called CCC/SB below); and 3) your current medical programs [(the "Current Medical Plan")], both over and under age 65.... [12]
>
> Effective January 1, 1993, retirees in the Primerica Group Insurance Plan for Retired Salaried Employees will begin paying premiums to cover 100% of the cost of continuing medical coverage. This decision is in line with Primerica's policy on medical coverage for retirees in those of its subsidiaries that offer continuing coverage.

26 Oct. 1992 Letter at 1.

The 26 Oct. 1992 Letter estimated the cost of the various program options for retirees as follows. The New Plan, available only to retirees over sixty-five, would cost $50.00 per person per month. *Id.* The CCC/SB plan would cost $296.00 to retirees under 65 and $100.00 to retirees sixty-five and over. *Id.* The cost of maintaining the Current Medical Plan would be $326.00 to retirees under sixty-five and $144.00 to retirees sixty-five and over. *Id.* The 26 Oct. 1992 Letter also recognized that "[s]ince the premiums for all of these programs are designed to cover 100% of the total cost, each is subject to increase in the future." *Id.*

Finally, the 26 Oct. 1992 Letter indicated that a number of additional benefits would be eliminated. *Id.* at 2. Specifically, Primerica informed its retirees in the 26 Oct. 1992 Letter that (1) the practice of "reimburs[ing] certain retirees for part of the cost of Medicare Part B" and (2) all "retiree life insurance coverage" would both be eliminated, effective 1 January 1993. *Id.*

On 2 December 1992, Defendants sent a follow-up letter to Plaintiffs further explaining the benefits changes in Plan. *See* Letter from O'Reilly, dated 2 December 1992 (the "2 Dec. 1992 Letter"), at 1–3. The cost to Plaintiffs of the various medical benefits options remained unchanged from the 26 Oct. 1992 Letter. *See* 2 Dec. 1992 Letter at 1–2. The 2 Dec. 1992 Letter further indicated that Plaintiffs'

> election to continue medical coverage through Primerica after 1992 [had to be] received ... by the close of business, Wednesday, December 23, 1992. If no election [was] received by that deadline, it [would be] assumed that [the individual] wish[ed] to discontinue [his/her] medical coverage and the coverage of any enrolled, eligible dependant effective 31 January 1991.

*Id.* at 4. The 2 Dec. 1992 Letter also warned that once a retiree chose to discontinue his or her medical coverage through Primerica, that retiree could not re-enroll in the Plan in the future. *Id.* at 2–4. Finally, the 2 Dec. 1992 Letter stated: "Primerica continues to reserve the right to change or discontinue the medical coverage it sponsors for retirees at any time." *Id.* at 5.

---

**11.** Five days later, on 13 October 1992, a status conference (the "13 Oct. 1992 Conference") was held. Transcript of Proceedings, dated 8 December 1992 (the "8 Dec. 1992 Hrg. Tr.") at 5–6, 8; Transcript of Proceedings, dated 13 October 1992 (the "13 Oct. 1992 Hrg. Tr."). During this conference, Plaintiffs' counsel acknowledged receipt of the 8 Oct. 1992 Letter. 8 Dec. 1992 Hrg. Tr. at 5–6, 8; 13 Oct. 1992 Hrg. Tr. at 1–7. Plaintiffs counsel did not suggest, however, that Plaintiffs intended to seek preliminary injunctive relief to prevent the changes outlined in the 8 Oct. 1992 Letter. 8 Dec. 1992 Hrg. Tr. at 5–6, 8; 13 Oct. 1992 Hrg. Tr. at 1–22.

**12.** Comparative summaries of the three plans were provided with the 26 Oct. 1992 Letter. *See id.* at 3–4.

With regard to life insurance, the 2 Dec. 1992 Letter explained that, even though life insurance coverage was to terminate on 31 December 1992, the beneficiary of a Plaintiff who died prior to 31 January 1993 would still "be entitled to receive [the] basic and supplemental death benefit as if [the] coverage had not been terminated. *Id.* at 4. Moreover, the 2 Dec. 1992 Letter indicated that a "conversion policy" would be issued to Plaintiffs who were former recipients of the Plan's life insurance policy. *Id.* at 4–5. Under the conversion policy, an individual life insurance policy would be issued at full cost to the Plaintiffs, effective 1 February 1993. *Id.* Plaintiffs were required to apply for and pay the first premium of this new life insurance by 31 January 1993. *Id.* at 5.

Plaintiffs have submitted eighteen affidavits (the "Hardship Affidavits") from members of the class which detail the alleged effect these changes will have on individual class members.[13]

### E.  Background to the Motion For Preliminary Injunction

On 1 December 1992, Plaintiffs served on Defendants the Preliminary Injunction Motion, in accordance with General Rule 12N, Appendix N, General Rules of the District Court for the District of New Jersey. *See* 8 Dec. 1992 Hrg.Tr. at 3; Affidavit of Michael R. Cole, filed 9 December 1992 (the "9 Dec. 1992 Cole Aff.") at 2–3. Despite the fact of a delay of fifty-three days from notification in the 8 Oct. 1992 Letter,[14] the Preliminary Injunction Motion seeks to enjoin Defendants "from instituting, effecting, or making any change in or to the [Plan] or to the medical health and life insurance benefits that are presently being provided by [D]efendants to [P]laintiffs." Notice of Motion at 2. In addition to a memorandum, Plaintiffs' motion is accompanied by affidavits,[15] including the eighteen Hardship Affidavits.

Unable to agree on a schedule for the motion, the parties appeared for a conference on 8 December 1992. *See* 8 Dec. 1992 Hrg.Tr. at 2–3; 9 Dec. 1992 Cole Aff. at 3. At the conference, Plaintiffs requested (1) Defendants be given until 15 December 1992 to file opposition to the motion, (2) Plaintiffs be given until 16 December 1992 to submit reply papers and (3) a decision from the court with regard to the preliminary injunction motion be issued by 23 December 1992. *Id.* at 9, 16. Defendants requested time to depose those retirees submitting affidavits with regard to the Preliminary Injunction Motion. *Id.* at 20.

After hearing the arguments presented by the parties, the expedited hearing, as requested, was denied and a modified expedited schedule was set for a decision on the Preliminary Injunction Motion. *See* Order, filed 9 December 1992 (the "9 Dec. 1992 Scheduling Order"), at 5–6. The Defendants were ordered to submit opposition by 8 January 1993. *Id.* at 5; 8 Dec. 1992 Hrg.Tr. at 18. Reply papers were to be submitted by 12 January 1993. *Id.* In addition, Defendants were permitted to depose the twenty-eight affiants, as requested. *Id.*

Because Plaintiffs' requested motion schedule was not adopted, on 9 December 1992, Plaintiffs filed an emergency appeal with the Circuit, pursuant to 28 U.S.C. § 1292(a)(1). *See* Notice of Appeal, filed 9 December 1992 (the "9 Dec. 1992 App. Notice"); 9 Dec. 1992 Cole Aff. at 2. In the alternative, Plaintiffs sought a writ of mandamus pursuant to 28 U.S.C. § 1651 to direct the court to hear the Preliminary Injunction Motion prior to 23 December 1992. *See* 9 Dec. 1992 Cole Aff. at 2; Brief and Appendix of Plaintiffs–Appellants–Pe-

---

**13.** While the Hardship Affidavits are moving, and while the court is not unsympathetic to the financial hardship which Plaintiffs may face as a result of the proposed changes in their benefits, these considerations cannot play a role in the determination of this matter.

**14.** Plaintiffs counsel has stated that they could not bring the Preliminary Injunction Motion until they received the information ultimately transmitted in the 2 Dec. 1992 Letter. Nevertheless, the Hardship Affidavits all respond to the 26 Oct. 1992 Letter.

**15.** Counsel for Plaintiffs has conceded that the twenty-eight affidavits are fact-intensive. 8 Dec. 1992 Hrg. Tr. at 14.

titioners to Third Circuit, filed 10 December 1992, at 2, 15. On 16 December 1992, the Circuit denied the writ of mandamus and dismissed the appeal. *See* Circuit Orders, filed 16 December 1992.

The parties now request a decision on whether a bond would be required as security and, if so, in what amount, should the Preliminary Injunction Motion be granted. Plaintiffs Bond Brief at 4; Primerica Bond Brief at 5. According to Plaintiffs:

> [P]laintiff class here does not have the financial ability to post a bond in any significant amount.... In reality, if the Court orders the posting of a bond, other than a very minimal one, as a condition to proceeding, the [P]laintiffs will be unable to comply.... If the Court rules that the posting of a significant bond is a prerequisite to the relief sought, the parties concur that there is nothing to be gained at this juncture by depleting [P]laintiffs' resources in preparing for and litigating the issues of likelihood of success on the merits and irreparable harm.

Plaintiffs Bond Brief at 4–5. If a significant bond is required, Plaintiffs will apparently forego a decision on the merits of the motion for a preliminary injunction and, instead, request expedited scheduling for trial on the merits. *Id.* at 5.

*Discussion*

Plaintiffs argue that a bond should not be required in this case. *Id.* at 1–3. Plaintiffs contend the posting of a bond may be waived at the court's discretion when, as in this case, the requirement poses an insur-

mountable financial burden to obtaining preliminary relief. *Id.* at 1–2. In support of this position, Plaintiffs rely primarily on *Temple University v. White,* 941 F.2d 201, 220 (3d Cir.1991), *cert. denied sub nom., Snider v. Temple University,* —— U.S. ——, 112 S.Ct. 873, 116 L.Ed.2d 778 (1992). Plaintiffs further argue: "[T]he hardship that a bond requirement would impose on the retiree plaintiff class far outweighs any impact Primerica would suffer if the requirement is waived." Plaintiffs Bond Brief at 3. Finally, Plaintiffs argue that, if they must post a bond, the court has discretion to set the bond at a nominal amount. *Id.* at 4–5.

Primerica argues that the bond requirement is mandatory and that a significant bond would be required if the motion for a preliminary injunction is granted because "[s]uch an injunction would require Primerica to continue its current retiree medical and life insurance program for the members of the [P]laintiff class until the action is finally concluded." Primerica Bond Brief at 1. Primerica estimates the life span of the preliminary injunction would be approximately eighteen months, assuming the case is tried in the Spring of 1993 with an additional year for the appellate process to run its course. *Id.*

Primerica contends the bond should cover the "incidental and consequential costs" which Primerica will incur should it be forced to continue its present level of benefits for Plaintiffs. *Id.* at 5. Primerica calculates that these costs total $7,733,514 for the eighteen months which the bond would cover.[16] *Id.* Therefore, Primerica

---

**16.** Primerica calculates this figure as follows:

> In the event no injunction issues, the coverage provided under the current plan would be available at a cost of $144 per month for [P]laintiffs over the age of sixty-five and $365 for [P]laintiffs under the age of sixty-five. Multiplying these costs by the relevant numbers of participants yields a total cost for calendar 1993 of $5,062,992, from which the fifty dollar per month per participant co-payment ($1,429,200 in the aggregate) must be subtracted. This yields a net outlay for calendar 1993 of $3,603,792 for medical insurance if Primerica is required to fund the program.
>
> Based on trends observed over the past years, Primerica estimates that costs will in-

> crease 11% for [P]laintiffs over the age of sixty-five and 20% for [P]laintiffs under the age of sixty-five. Thus, the 1994 cost for those over sixty-five would be $3,909,047 and for those under sixty-five it would be $1,849,594, for a total of $5,758,641. Subtracting the $1,459,200 co-payment yields a net cost of $4,299,441, or $358,287 per month, in 1994. Six months would cost approximately $2,149,-722. Thus, eighteen months of being forced to underwrite the medical plan alone would cost Primerica approximately $5,753,514....
>
> The Life insurance benefit is provided under an experience rated group contract, so the cost of the program is equal to the cost of claims plus administration. In 1992 that cost was $1,320,000, or $110,000 per month. As-

**1034**

requests the bond be set in this amount. *Id.*

### A. *The Bond Requirement*

Fed.R.Civ.P. 65(c) provides: *"No re-straining order or preliminary injunction shall issue except upon the giving of security by the applicant...."* *Id.* (emphasis added). On its face, Rule 65(c) "admits no exceptions" and, indeed, the Circuit has "interpreted the bond requirement very strictly." *Hoxworth v. Blinder, Robinson & Co.,* 903 F.2d 186, 210 (3d Cir.1990). The Circuit has stated:

> Although the amount of the bond is left to the discretion of the court, the posting requirement is much less discretionary. While there are exceptions, the instances in which a bond may be required are so rare that the requirement is almost mandatory. We have previously held that *absent circumstances where there is no risk of monetary loss to the defendant,* the failure of a district court to require a successful applicant to post a bond constitutes reversible error.

*Hoxworth,* 903 F.2d at 210 (emphasis added); *Frank's GMC Truck Center, Inc. v. General Motors Corp.,* 847 F.2d 100, 103 (3d Cir.1988).

The Circuit has recognized that "important policies undergird [ ] a strict application of the bond requirement in most injunction granting contexts." *Instant Air Freight Co. v. C.F. Air Freight, Inc.,* 882 F.2d 797, 805–06 n. 9 (3d Cir.1989); *see also Hoxworth,* 903 F.2d at 210. An incorrect interlocutory order "may harm the defendant and a bond provides a fund to use to compensate incorrectly enjoined defendants." *Instant Air,* 882 F.2d at 804; *Hoxworth,* 903 F.2d at 210. A bond also "deters rash applications for interlocutory orders; the bond premium and the chance of liability on it cause plaintiff to think

carefully beforehand." [17] *Instant Air,* 882 F.2d at 804.

Such protection is important for two reasons. First, a defendant wrongfully enjoined has recourse *only* against the bond; there is no independent action for damages in the absence of a bond. *W.R. Grace & Co. v. Local Union 759, etc.,* 461 U.S. 757, 770 n. 14, 103 S.Ct. 2177, —— n. 14, 76 L.Ed.2d 298 (1983); *Instant Air,* 882 F.2d at 804; *Frank's GMC,* 847 F.2d at 103 n. 5. Second, because of the "attenuated procedure" involved in an application for a preliminary injunction, "an interlocutory order has a higher than usual chance of being wrong." *Instant Air,* 882 F.2d at 804; *see also Hoxworth,* 903 F.2d at 210; *Clark v. K–Mart,* 979 F.2d 965, 968 (3d Cir.1992) ("preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits").

Although the Circuit has recently adopted a narrow exception to the mandatory bond requirement, *see Temple University,* 941 F.2d at 219–20, prior to this decision "[n]o Third Circuit case ... ha[d] upheld a district court's excuse of th[e bond] requirement." *Hoxworth,* 903 F.2d at 210. In fact, it had been expressly recognized that exceptions to the bond requirement, "if they are to be drawn at all, should be drawn narrowly." *Hoxworth,* 903 F.2d at 210.

In *Temple University,* it was recognized that in limited types of cases "a strict reading of Rule 65(c) would be inappropriate." 941 F.2d at 219. Specifically, the court in *Temple University* explained:

> First, at least in noncommercial cases, the court should consider the possible loss to the enjoined party together with the hardship that a bond requirement would impose on the applicant....

---

suming no increase in costs, Primerica estimates the costs of being forced to continue the program over eighteen months to be $1,980,000....

Primerica Bond Brief at 5–6. Under these calculations, the cost to Primerica would be $5,753,514 (medical insurance) plus $1,980,000

(life insurance) for a total of $7,733,514, or $429,640 per month. *Id.* at 6.

**17.** A bond also serves to inform plaintiffs of the maximum price they can expect to pay if an injunction was wrongly issued. *Hoxworth,* 903 F.2d at 210 n. 31; *Instant Air,* 882 F.2d at 804–05.

*Id.* (quoting *Crowley v. Furniture & Piano Movers, Furniture Store Drivers, etc.*, 679 F.2d 978, 1000 (1st Cir.1982), *rev'd on other grounds*, 467 U.S. 526, 104 S.Ct. 2557, 81 L.Ed.2d 457, *reh'g denied*, 468 U.S. 1224, 105 S.Ct. 19, 82 L.Ed.2d 915 (1984)). Moreover, the court recognized "the special nature of suits to enforce important federal rights or 'public interests,' arising 'out of the comprehensive federal health and welfare statutes.'" *Id.* In such a case, the "district court should consider the impact that a bond requirement would have on enforcement of such a right, in order to prevent undue restriction of it." *Id.*

Central to the holding in *Temple University* was the fact that no threat of loss to the defendant was presented by issuing the requested injunction. In *Temple University*, an injunction was issued against the Pennsylvania Department of Welfare (the "PDW"), requiring the PDW to make continued reimbursement payments to Sacred Heart Hospital ("Sacred Heart") for its inpatient treatment of Medicaid patients. *Id.* at 216–19. The dispute arose because the PDW recalculated the reimbursement rates which it was obligated to expend under the Federal Medicaid Program, Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.*, and reduced payments to certain hospitals. *Temple University*, 941 F.2d at 205–06. The court determined that issuing the injunction and requiring payment to Sacred Heart posed "virtually no risk" to the PDW "because of the probability that the hospital would be entitled to as much or more monies pursuant to the PDW's M[edicaid] A[ssistance] P[rogram]." *Id.* at 219. PDW could simply "recoup any overpayment of funds by withholding future payments to Sacred Heart." *Id.* at 219–20.

This concern for potential loss to the enjoined party permeates much of the Circuit's jurisprudence with regard to the bond posting requirement in preliminary injunction cases. In *System Operations, Inc. v. Scientific Games Dev. Corp.*, 555 F.2d 1131 (3d Cir.1977), for instance, the court vacated an injunction issued by the District Court without a bond which restricted defendants in their efforts to procure new instant lottery ticket contracts. *Id.* at 1145. The *System Operations* court recognized that "the potential for monetary loss is indeed substantial" and stated the rule that "in these circumstances, a district court commits reversible error when it fails to require the posting of a security bond by the successful applicant for a preliminary injunction." *Id.*

This concern was later expressed in *Frank's GMC*, 847 F.2d at 103, in which the court again vacated an injunction granted without a bond. In *Frank's GMC*, the injunction required defendant General Motors Corporation ("GM") to continue supplying parts and warranty administration to plaintiff Frank's GMC. *Id.* at 103. The court stated:

> We have held that *absent circumstances where there is no risk of monetary loss to the defendant,* the failure of a district court to require a successful applicant to post a bond constitutes reversible error. Here, there was evidence in the record indicating that GM would incur substantial costs in complying with the terms of the injunction. Indeed, the district court recognized that "although harm would occur to GM if the preliminary injunction was continued and not stayed or dissolved … it is not irreparable, and pales in significance to the potential loss of Plaintiff." [18] *Given the clear possibility that GM could be forced to incur costs with no way to seek restitution if Frank's GMC does not prevail, it was error for the court below to deny GM's request for a bond.*

*Id.* at 103 (emphasis added) (citations omitted).

Again, in *Instant Air*, 882 F.2d at 803–05, the court distinguished cases in which "the injunction poses no risk of monetary harm to the defendant" and vacated a preliminary injunction for failure by the Dis-

---

18. The business terminated by GM constituted 25.6 percent of Frank's GMC's gross profit.

*Frank's GMC*, 847 F.2d at 102 n. 4.

trict Court to require the movant to post a bond. *Id.* at 803–04 & n. 8. The court held that, because the injunction required defendant C.F. Air Freight ("C.F.") to keep open a terminal it intended to close, "clearly C.F. may suffer monetary loss" and "the district court erred in issuing the preliminary injunction without requiring Instant [Air] to post a bond." [19] *Id.* at 803–05 & n. 8.

Finally, in *Hoxworth*, 903 F.2d at 209–11, the Circuit again found reversible error and vacated a preliminary injunction for failure by the district court to require a bond. *Id.* In the process, the *Hoxworth* court commented on its prior jurisprudence:

> *System's [System] Operation [Operations]* ... did not recognize an exception to rule 65(c). *System's [System] Operations* involved a case in which the defendant faced the potential for substantial monetary losses from compliance with the injunction. In that context, we held that "a district court commits reversible error when it fails to require posting of a security bond by the successful applicant for a preliminary injunction," and we expressly reserved the question "whether a court may dispense with the posting of a bond in a case where the injunction raises no risk of monetary harm to the defendants." At most, therefore, *Frank's GMC Truck* and *System's [System] Operations* excuse the posting of a bond when complying with the preliminary injunction raises *no* risk of monetary harm to the defendant.

*Id.* at 210 (citation omitted).

■ The law in this Circuit is clear— when a risk of financial harm exists for the party to be enjoined, the posting of a security bond is required. *Id.; Instant Air,* 882 F.2d at 803–05 & n. 8; *Frank's GMC,* 847 F.2d at 103; *System Operations,* 555 F.2d at 1145–46. This principle was not changed in *Temple University.* The court in *Temple University* held that, even in those "narrowly drawn" circumstances in which waiver of a bond requirement would

be permissible, a district court must still "consider the possible loss to the enjoined party." 941 F.2d at 219–20. Indeed, a central point of the analysis in *Temple University* concerned the absence of any risk of loss to the defendant because of its ability to recoup any overpayment of funds caused by the injunction. *Id.*

■ In this case, Primerica will be exposed to significant economic loss should it be enjoined from making the proposed changes in the Plan. Primerica will be required to bear the financial burden for maintaining the medical and life insurance coverage at the present levels for all Plaintiffs in the class. As indicated below, *see infra* at p. 1038, such an injunction would cause Primerica to expend over $1.7 million between now and the anticipated time of trial in April 1993. In all likelihood, by the time the appellate process runs its course, Primerica will have expended more than $7,000,000 as a result of the injunction.

Unlike *Temple University,* this is not a case in which Primerica can easily recoup or set off any expenditures made because of a wrongly-issued injunction. Primerica cannot practically pursue the various class members in hundreds, if not thousands, of individual lawsuits around the country.[20] Nor does it appear Primerica could offset its losses against the pension benefits received by some Plaintiffs; such pension benefits are likely protected by the anti-alienation provision of ERISA. *See* 29 U.S.C. § 1056(d)(1) ("Each pension plan shall provide that benefits provided under the plan may not be assigned or alienated."). As provided by 29 U.S.C. § 1056(d)(2), any assignment of pension benefits would have to be voluntary and revocable. *See id.* Thus, there is no guarantee that an attempt to offset loss against pension benefits would be sufficient to cover Primerica's loss or that Plaintiffs would

---

19. The potential harm to plaintiffs in *Instant Air* was even greater than that present in *Frank's GMC.* In *Instant Air,* 80 percent of Instant Air's business was devoted to servicing the terminal which CF had targeted for closing. 882 F.2d at 798.

20. Even if Primerica could pursue such lawsuits, given Plaintiffs' claims of indigence, there is no guarantee that, as in *Temple University,* Plaintiffs will be able to re-pay the monies wrongly expended by Primerica.

concede to offsetting without further litigation.

Plaintiffs' arguments against the requirement of a bond are without merit. For instance, Plaintiffs argue that "[i]t is well settled in the various circuits that the requirement of a bond may be waived where the inability to post a bond would deprive the applicant of injunctive relief." Plaintiffs Bond Brief at 2. The Third Circuit has expressly rejected this position and has stated that the prohibitive effect of a bond is not sufficient for dispensing with the bond requirement:

> It is true that a bond may create a barrier to the granting of a preliminary injunction. The barrier fulfills one of the purposes of the bond requirement.... The bond grows out of the idea that because of the attenuated procedure, an interlocutory order has a higher than usual chance of being wrong.... A bond deters rash applications for interlocutory orders by causing ... plaintiff to think carefully beforehand.

*Instant Air*, 882 F.2d at 804 (rejecting argument that bond requirement should be waived because plaintiff could not afford to post it); *see also Hoxworth*, 903 F.2d at 186 (stating that "chilling effect" of bond "cannot justify excusing bond requirement").

Plaintiffs cite *Temple University* and cases from other Circuits for the proposition that the indigence of plaintiffs is a sufficient reason for excusing the bond requirement. *See* Plaintiffs Bond Brief at 2–3 (citing *Wayne Chemical, Inc. v. Columbus Agency Service Corp.*, 567 F.2d 692, 701 (7th Cir.1977); *Doe v. Perales*, 782 F.Supp. 201, 206 (W.D.N.Y.1991); *Governing Council of Pinoleville Indian Community v. Mendocino County*, 684 F.Supp. 1042, 1047 (N.D.Cal.1988); *Toussaint v. Rushen*, 553 F.Supp. 1365, 1383 (N.D.Cal. 1983), *aff'd in part and rev'd in part sub nom., Toussaint v. Yockey*, 722 F.2d 1490 (9th Cir.1984)). This proposition is neither the law in this Circuit nor does it accurately characterize the holding in *Temple University*.

The Circuit has not held that indigence alone is a sufficient ground for waiving the bond requirement in granting a preliminary injunction. In fact, the court implicitly rejected such a broad position in *Hoxworth* when it stated:

> Commentators have suggested excusing the bond requirement "when plaintiff is indigent or is suing in the public interest." *See* Note, *Recovery for Wrongful Interlocutory Injunctions Under Rule 65(c)*, 99 Harv.L.Rev. 828, 833 (1986). We believe that these exceptions, *if they are to be drawn at all, should be drawn narrowly.*

903 F.2d at 211 n. 32 (emphasis added).

In *Temple University*, moreover, the Circuit drew the lines it referred to *Hoxworth*. Rather than automatically waiving the bond requirement when plaintiffs are indigent, the court determined that the court should balance the "equities of potential hardships to the parties." 941 F.2d at 219–20. Thus, under *Temple University*, a district court must consider *both* "the possible loss to the enjoined party [and] the hardship that a bond requirement would impose on the applicant." *Id.* Significantly, Plaintiffs do not address the potential hardship to Primerica should an injunction wrongly issue.[21]

Finally, Plaintiffs argue that the posting of a bond "would effectively deny the [P]laintiffs ability to pursue their claims." Plaintiffs Bond Brief at 3 (citing *Temple University*, 941 F.2d at 220; *California ex rel. Van de Kamp v. Tahoe Regional Planning Agency*, 766 F.2d 1319, 1325 (9th Cir.1985)). This argument fails because, even if the bond requirement precludes pursuit of a preliminary injunction, the same issue underlies the litigation in general—namely, whether Primerica may unilaterally change Plaintiffs' retirement benefits. Thus, regardless of the outcome of the preliminary injunction motion, this is-

---

**21.** Without any discussion of potential loss to Primerica, Plaintiffs state: "The hardship that a bond requirement would impose on the retiree plaintiff class far outweighs any impact Primerica would suffer if the requirement is waived." Plaintiffs Bond Brief at 3.

sue will still be decided at trial.[22] Moreover, as discussed above, the "chilling" effect of a bond cannot, by itself, justify waiving the bond requirement.[23] *Hoxworth*, 903 F.2d at 186; *Instant Air*, 882 F.2d at 804.

In light of both the strict posture assumed by the Third Circuit in enforcing the bond requirement under Fed.R.Civ.P. 65(c) and the significant and unrecoverable loss that Primerica will suffer if an injunction is wrongly granted, a bond is required in this case. As discussed, on at least four occasions the Circuit has vacated preliminary injunctions granted without a bond requirement on the ground that the defendant would suffer unrecoverable financial loss as a result of the injunction. Because the potential for unrecoverable loss is both present and significant in this case, the balance of hardships and the relevant case law require a bond should a preliminary injunction be granted.

### B. *Amount of the Bond*

■ The amount of a bond is within the discretion of the court. *Hoxworth*, 903 F.2d at 210; *Frank's GMC*, 847 F.2d at 103. Rule 65(c) states that the bond "may be in such a sum as the court deems proper." *Id.* In keeping with the policies of reimbursement and protection which underlie the bond requirement, Rule 65(c) also provides that the bond is "for the payment of *costs* and *damages* as may be incurred or suffered" by party wrongfully restrained. Fed.R.Civ.P. 65(c) (emphasis added); *Hoxworth*, 903 F.2d at 210–11; *Instant Air*, 882 F.2d at 804.

■ As indicated by Primerica's calculations, *see supra* n. 16, the potential financial damage to be incurred by Primerica is significant. Even if a bond were required only to cover the costs of an injunction between now and a trial in April, a bond in the amount of $1,718,560 ($429,640 per month × four months) would be required. Moreover, it appears Primerica's contention that appellate review would take approximately one year and, therefore, that the total time period in which the injunction would be in effect would be eighteen months, is correct.[24] The cost to Primerica for maintaining its present level of retirement benefits for these eighteen months would be $7,733,514 ($429,640 per month × eighteen months).

Plaintiffs' argument that the bond amount should be nominal is not persuasive. Plaintiffs Bond Brief at 3–5. While the court in *Temple University* recognized that, in an appropriate case, a nominal bond could be posted, *see* 941 F.2d at 220 n. 28, this is not such a case. Where a defendant wrongfully enjoined would suffer significant economic harm, posting of a nominal bond would defeat the very purposes of the bond requirement. Such a result belies both the language and spirit of Rule 65, *see* Fed.R.Civ.P. 65(c) (bond is "for the payment of *costs* and *damages* as may be incurred or suffered" by party wrongfully restrained), and is not supported by the case law in this Circuit.[25] *Hoxworth*, 903

---

**22.** Even if some members of the Plaintiff class choose not renew their medical coverage with Primerica as a result of the most recent proposed changes in the Plan, it has neither been suggested nor does there appear to be any reason why these class members would lose their standing to challenge the actions of Primerica which, they allege, have harmed them. Moreover, because Plaintiffs seek permanent injunctive relief, medical and life insurance benefits could be re-instated and ordered to operate retroactively should Plaintiffs succeed at trial.

**23.** Plaintiffs also suggest that an additional reason not to require a bond exists in cases where the likelihood of success is extraordinarily high. Plaintiffs Bond Brief at 2 n. 1 (citing *Crowley*, 679 F.2d at 1000 n. 25). While a decision on Plaintiffs' likelihood of success is reserved, it is doubtful Plaintiffs have demonstrated such an "extraordinarily high" likelihood of success to justify waiver of a bond. *See supra* pp. 1028–29 and n. 9.

**24.** The eighteen months includes: four months until trial in April 1993, two months for trial and twelve months for any appeal. Although the time for trial and for appeal may be overestimated, Plaintiffs' representations of indigence indicate that a bond simply for the four months until trial would be prohibitive.

**25.** In support of their statement that "courts have held that [Rule 65(c)] does not require a bond in the full amount of any and all damages that the defendant may suffer," Plaintiffs cite only *Division No. 1, Brotherhood of Locomotive*

F.2d at 210; *Instant Air*, 882 F.2d at 803–05 & n. 8; *Frank's GMC*, 847 F.2d at 103 (emphasis added); *System Operations*, 555 F.2d at 1145–46. *Cf. Clark*, 979 F.2d at 969.

*Conclusion*

For the reasons set forth above, Plaintiffs would be required to post a bond of at least $7,733,514 should the motion for a preliminary injunction be granted.

Engineers v. Consolidated Rail Corp, 844 F.2d 1218, 1227 n. 15 (6th Cir.1988) (quoting *Russell v. Farley*, 105 U.S. (15 Otto) 433, 441, 26 L.Ed. 1060 (1882)). In light of the recent decisions from this Circuit, this Sixth Circuit decision is not followed.