Judd ALEXANDER and Richard Edwards, on behalf of themselves and as representatives of a Class of persons similarly situated, Plaintiffs,

v.

PRIMERICA HOLDINGS, INC. formerly known as Primerica Corporation, The Board of Directors of Primerica Holdings, Inc., James Dimon, Irwin Ettinger, John Fowler, John Doe 1–10 (being individual members of the Primerica Holdings, Inc. Board of Directors), and ABC (being the administrator of the American Can Salaried Retiree Group Insurance Plan), Defendants.

Civ. A. No. 89–5151 (AJL).

United States District Court, D. New Jersey.

May 6, 1993.

Gerald A. Liloia, Stuart Peim, David P. Arciszewski, Robert D. Towey, Charles A. Weiss, Riker, Danzig, Scherer, Hyland & Perretti, Morristown, NJ, for plaintiffs.

Harvey Kurzweil, Dewey Ballantine, New York City, and Donald A. Robinson, Robinson, St. John & Wayne, Newark, NJ, for defendants.

## OPINION

LECHNER, District Judge.

This is a class action brought by plaintiffs Judd Alexander and Richard Edwards on behalf of themselves and persons similarly situated (collectively, the "Plaintiffs") against defendants Primerica Holdings, Inc. ("Primerica Holdings"), the Board of Directors of Primerica (the "Board of Directors"), James Dimon ("Dimon"), Irwin Ettinger ("Ettinger"), John Fowler ("Fowler") and ABC ("ABC") (collectively, "Primerica").[1] Plaintiffs brought suit to declare and enforce their asserted rights to medical insurance benefits, life insurance benefits and survivor income benefits under a retirement welfare benefits plan (the "Plan") established by the American Can Company ("American Can"), a predecessor of Primerica. Plaintiffs claim Primerica has violated the provisions of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, by modifying the Plan.

---

1. ABC appears to be an arbitrary designation for whatever Plaintiffs contend is the administrative body for the American Can Salaried Retiree Group Insurance Plan. Amended Complaint (the "Amended Complaint"), filed 9 January 1991, ¶ 9.

Jurisdiction is specifically alleged in the Amended Complaint under section 502 of ERISA, 29 U.S.C. §§ 1132(a)(1)(B), 1132(a)(2) and 1132(a)(3)(A) & (B). Amended Complaint, ¶ 2. It is presumed jurisdiction is also alleged under 29 U.S.C. § 1132(e).[2] Currently before the court is a motion by Plaintiffs to disqualify the law firm of Dewey Ballantine ("Dewey Ballantine") as attorneys for Primerica.[3] For the reasons that follow, the motion by Plaintiffs is denied.

*Facts*

A. *The Parties and the Plan*

Primerica Holdings is a corporation organized under the laws of the State of Delaware; it maintains its principal place of business in the State of Connecticut. Amended Complaint, ¶ 5. Dimon, Ettinger and Fowler are or were members of the Board of Directors of Primerica Holdings. *Id.,* ¶ 8. Primerica Holdings is the surviving entity of a merger between Primerica Holdings and Primerica Corporation ("Primerica Corporation") in December 1988. *Id.,* ¶ 6. Primerica Corporation was organized under the laws of the State of New Jersey and, until April 1987, was known as American Can.[4] *Id.* Plaintiffs are either retired salaried employees of American Can or their surviving spouses. *Id.,* ¶¶ 3–4, 11.

Beginning in 1957, American Can maintained the Plan which is a retirement welfare benefits plan for qualified salaried employees who retired. *Id.,* ¶ 21. The terms of the Plan were set forth in a series of summary plan descriptions (the "SPDs") which, pursuant to ERISA, must be furnished to Plan beneficiaries. *See* 29 U.S.C. § 1022. The benefits under the Plan included a pension, life insurance and medical insurance. Amended Complaint, ¶ 21.

It is uncontroverted Plaintiffs are former salaried employees and that their surviving spouses are eligible to receive retirement welfare benefits under the Plan. It is also uncontroverted Plaintiffs received benefits under the Plan. Plaintiffs' allegations that "repeated representations were made to employees and retirees alike" that their retirement benefits would be provided by Primerica "for life" are, however, contested.[5] *Id.,* ¶ 22.

Plan beneficiaries are required to make mandatory monthly contributions to cover a portion of the cost of the Plan. Apparently, the amount of the monthly mandatory contributions which Plan beneficiaries are required to make was, until 1 February 1989, $5.00 per covered Plan participant.[6] *Id.,* ¶ 30. Plaintiffs allege Primerica's predecessor,

2. Section 1132(e) provides, in pertinent part:
 (1) ... [T]he district courts of the United States shall have exclusive jurisdiction of civil actions under [ERISA] brought by ... a participant, beneficiary, or fiduciary....
 29 U.S.C. § 1132(e)(1).

3. In support of their motion to disqualify Dewey Ballantine, Plaintiffs have submitted the following: Memorandum of Law in Support of Plaintiffs' Motion to Disqualify Dewey Ballantine as Attorneys for Defendants (the "Moving Brief"); Affidavit of Robert D. Towey (the "Towey Aff."); Affidavit of William F. May (the "May Aff."); Affidavit of William Brewster (the "Brewster Aff."); Affidavit of Robert B. Bogart (the "Bogart Aff."); Affidavit of Eugene Ecker (the "Ecker Aff."); Affidavit of William Carlin (the "Carlin Aff."); Affidavit of Sal Giudice (the "Giudice Aff."); Reply Memorandum of Law in Support of Plaintiffs' Motion to Disqualify Dewey Ballantine as Attorneys For Defendants (the "Reply Brief"); Reply Certification of William F. May (the "May Reply Cert."); Reply Certification of Robert D. Towey (the "Towey Reply Cert."); Certification of Jeffrey M. Siminoff.
 In opposition to the motion by Plaintiffs, Defendants have submitted the following: Memo-

randum of Law in Opposition to Plaintiffs' Motion To Disqualify Dewey Ballantine as Attorneys for Defendants (the "Opp. Brief"); Affidavit of William B. Warren (the "Warren Aff."); Affidavit of Carol Trencher Ivanick (the "Ivanick Aff."); Affidavit of Harvey Kurzweil (the "Kurzweil Aff."); Affidavit of Jacob S. Pultman (the "Pultman Aff."). Affidavit of Geoffrey C. Hazard.
 Oral argument was heard on 27 April 1993.

4. Plaintiffs allege Primerica Corporation and then Primerica Holdings succeeded to all of the obligations of American Can under the Plan. *Id.,* ¶ 29. Primerica has disputed this allegation. *See* Answer to Amended Complaint, filed 13 February 1991, ¶ 6.

5. Primerica denies making " 'repeated representations' that the retirees' medical insurance benefits were 'for life.' " Defendants' Answers to Plaintiffs' Initial Set of Interrogatories (the "Primerica Inter. Ans."), No. 2.

6. It appears other changes in the monthly contribution preceded the February 1989 increase. These changes included an increase in the contribution to the medical insurance paid by retirees

American Can, had agreed the amount of those contributions would never increase. Plaintiffs allege American Can

> promised the [P]laintiffs by various means, including oral representations, publications, documents, brochures and a general course of dealing that it would provide [P]laintiffs with the protection and security of the American Can Retirement Program, including lifetime pension, life insurance and lifetime medical insurance benefits upon retirement and that the lifetime medical insurance benefits would be so provided *at a fixed, nominal cost to retirees.*

*Id.,* ¶ 23 (emphasis added). Plaintiffs further allege these benefits were "irrevocable upon retirement" and that American Can could neither unilaterally terminate any of the benefits nor unilaterally increase the cost of the medical insurance coverage.[7] *Id.,* ¶¶ 25–27.

Plaintiffs allege that American Can "at no time reserved to itself the right to unilaterally terminate" benefits under the Plan or to increase the cost of those benefits. *Id.,* ¶¶ 26–27. The SPDs, for their part, neither expressly prohibit nor expressly provide for raising the amounts of the mandatory contributions. All but one SPD, however, contain the following provision:

> The Company expects to continue this Plan indefinitely, but necessarily reserves the right to amend, modify, or discontinue the Plan in the future in conformity with applicable legislation....

Affidavit of Sal Giudice, dated 6 March 1991, Ex. A at 5.

In addition, it appears most employees of American Can signed one of two forms upon registering for coverage under the Plan. These forms indicate the contribution amount for retirees was understood to be subject to change. *See* Letter from Harry Kurzweil, dated 8 October 1992 (the "8 Oct. 1992 Letter"), at 2–3 (attached as Exhibit E to Kurzweil Aff.).

from $0.85 per month to $1.70 per month in December 1985, another increase to $3.55 per month in July 1973, and a further increase to $5.00 per month in January 1984. Primerica Inter. Ans. No. 3.

**7.** In addition to the changes in retiree contribution amounts, Primerica has documented a history of unilateral changes made in medical cover-

The first form ("Form A"), is a one page form entitled "Deduction Authorization— Comprehensive Medical Plan Coverage For Retirees Receiving Benefits Under the American Can Company Plan For Salaried Employees." *See id.* Form A contains the following:

> *I understand that the monthly charge for this coverage is subject to change in the future.* If the cost of this coverage is changed, I will be notified in advance and given the option of continuing my coverage at the new monthly cost or terminating my coverage.
>
> I request and authorize you to direct Bankers Trust Company ... to deduct from retirement payments I receive under the ... Plan amounts equal to the coverage I have indicated above and to pay these amounts to American Can.... This authorization will continue to apply until canceled by me by written notice.... This authorization will not remain in effect *if American Can discontinues extending medical coverage* to me and/or to my eligible dependant.

*Id.* (emphasis added).

The second form ("Form B") is a shorter version of Form A, entitled "Deduction Authorization Card For Retired Employees Who Are Receiving Benefits Under the American Can Company Retirement Plan For Salaried Employees and Who Desire To Obtain Major Medical Insurance Plan Coverage." *Id.* Form B contains the statement: "I want [the] Major Medical Insurance Plan coverage indicated by my check mark." *Id.* Form B then offers the retiree three options to choose from: (a) "Retiree with spouse ($7.10 + $2.72 for each dependant child)," (b) "Retirees Only ($3.55 per month *initially* )" and (c) "Retiree with Spouse ($7.10 per month *initially* )." *Id.* (emphasis added). Form B also contains language similar to Form A:

age under the Plan. *See* Primerica Inter. Ans. No. 3. These changes allegedly demonstrate that Primerica "at all times intended to reserve its right to amend, modify or discontinue the Plan" and that Primerica "had no fiduciary obligation to maintain the Plan or any other of Plaintiffs' welfare benefits, at specific levels or at specific costs." *Id.,* Nos. 10–11.

I request and authorize you to direct Bankers Trust Company ... to deduct from retirement payments I receive under the ... Plan amounts equal to charges for such Major Medical Insurance Plan coverage and to pay over such amounts to American Can.... This request and authorization will continue to apply until canceled by me by written notice ... *notwithstanding any changes in benefits or charges or any cessation of my coverage* not communicated to you.

*Id.* (emphasis added).

On or about 9 January 1989, Primerica notified Plan beneficiaries it was increasing the amount of their monthly mandatory contributions to the group medical insurance plan. Amended Complaint, ¶ 30. The contributions were increased from the then current amount of $5.00 per covered individual per month to $50.00 per covered individual per month. *Id.* The increase went into effect on 1 February 1989. *Id.* The contributions were and are automatically deducted from each Plan beneficiary's monthly pension check unless Primerica was or is notified the beneficiary intended to terminate his or her coverage. *Id.* Some members of the Plaintiffs' class apparently opted to terminate coverage under the Plan following the February 1989 increase. Subsequently, Plaintiffs commenced this suit against Primerica.

### B. *The Complaint and Class Certification*

On 14 December 1989, Plaintiffs filed their complaint (the "Complaint"). The Complaint contained six counts—four counts under common law contract theories of recovery (the "Common Law Contract Counts"), as well as two counts under ERISA for breach of fiduciary duty and failure to disclose reservation of rights. *See* Complaint, ¶¶ 28–71. In the Complaint, Plaintiffs demanded a "trial by jury as to all issues so triable." *Id.* at 31.

On 31 August 1990, Plaintiffs moved for class certification. *See* Notice of Motion, filed 31 August 1990. Primerica opposed the motion for certification because, *inter alia*, it argued the Common Law Contract Counts

could not be litigated on a class-wide basis. On 15 October 1990, the motion for certification was denied without prejudice for the purpose of permitting the parties to submit briefs on whether the Common Law Contract Counts were preempted by ERISA. *See* Order, filed 15 October 1990.

In lieu of briefs concerning the pre-emption question, Plaintiffs requested and were given leave to file the Amended Complaint. *See* Order of Magistrate Judge Ronald J. Hedges, filed 31 January 1991. The Amended Complaint deleted the four Common Law Contract Counts and, instead, asserted four counts under ERISA. Thereafter, on 13 May 1991, Primerica stipulated to class certification. *See* Consent Order Regarding Certification (the "Consent Order"), filed 13 May 1991. Plaintiffs' class was certified as consisting of:

> ... [A]ll salaried retirees of American Can and their spouses, and the spouses of all deceased former employees of American Can, excluding those salaried retirees (and their spouses or surviving spouses) who were designated by American Can, as retirees of its "Packaging Sector" in connection with the sale of the packaging operations of American Can to Triangle Industries.

Consent Order at 2.

### C. *Motion For Summary Judgment*

On 25 July 1991, summary judgment was granted in favor of Primerica. *See* Letter-Opinion, filed 25 July 1991 (the "25 July 1991 Decision"), 47; Order, filed 25 July 1991, at 1–2. On appeal, the Circuit reversed and remanded the case. *See Alexander v. Primerica Holdings, Inc.,* 967 F.2d 90, 96 (3d Cir.1992). The Circuit concluded that the SPDs did not unambiguously set forth a reservation of the right by Primerica to reduce future benefits and that this ambiguity was a question of fact to be resolved at trial. *Id.* The case was remanded for "an interpretation of the [SPDs] in light of *all* relevant evidence and for the district court's further consideration of the retirees' claims." *Id.* at 95 (emphasis added). The Circuit explained:

> Because a Plan document does not exist and because the [SPDs] are ambiguous,[8]

---

8. In support of their cross-motions for summary judgment, the parties relied upon the SPDs as

the operative expressions of the Plan, notwith-

the district court, as the trier of fact, must determine whether the Plan provided lifetime benefits upon retirement.... In interpreting an ambiguous ERISA plan, a court may consider the intent of the plan's sponsor, the reasonable understanding of the beneficiaries, and past practice, among other things. In this regard, we note that the retirees' affidavits and documents, if believed by the district court, are sufficient to show that the Plan promised lifetime irreducible benefits.[9]

*Id.* at 96 (citations omitted).

### D. *Subsequent Changes to the Plan*

On 8 October 1992, Primerica notified the court and counsel for Plaintiffs that it again intended to change their benefits under the Plan. *See* 8 Oct. 1992 Letter at 5–6. The 8 Oct. 1992 Letter stated in pertinent part:

As we mentioned at the conference on September 22, 1992, recent accounting rule changes will require Primerica to record as a liability the value of all retiree welfare benefits, including life insurance and medical insurance. This rule, known as FAS 106, takes effect no later than January 1, 1993....

We have reviewed the evidence produced in discovery since remand and we are of the view that the record supports Primerica's position that the reservation of rights in the [SPDs] was intended to permit the Company to change the cost of benefits to retirees....

Primerica does not believe it should be required to book the significant liability required by FAS 106—effectively acting as though it had lost the case—only because the litigation will not be resolved before the rule takes effect. Consequently, the Company will soon announce that, effective January 1, 1993, the members of the class will be offered, at full cost to the participants, several welfare plan options, including (1) the benefits plan under which they are presently covered, and (2) other group health and life insurance plans similar to those offered to all other Primerica retirees.

*Id.* (emphasis added).

On 26 October 1992, Primerica notified its retirees of the additional changes in benefits. *See* Letter from Kevin T. O'Reilly, dated 26 October 1992 (the "26 Oct. 1992 Letter"). The 26 Oct. 1992 Letter stated:

With this letter, we are notifying you of an additional change in your rates; but, we are offering you some additional coverage choices as well.

In 1993, Primerica will offer the following choice of coverage: 1) a newly designed program [ (the "New Plan") ] only for retirees and/or spouses over age 65 that has been designed to cost the same $50 per month as you are currently paying; 2) the programs currently offered to Primerica Corporate ... retirees, both over and under age 65 (called CCC/SB below); and 3)

standing the fact that the SPDs are merely summaries of the Plan. *See* 25 July 1991 Decision at 5 n. 5. Because neither party submitted Plan documents which set forth the details of the various forms of insurance and other benefits under the Plan, the motions of the parties were decided on the basis of the SPDs.

Significantly, since the decision on the cross-motions for summary judgment and the decision on appeal were rendered, continued discovery revealed the existence of Plan documents, as well as Forms A and B signed by individual members of the Plaintiff class upon registering for benefits through Primerica.

In addition, Primerica has brought to the attention of the court two affidavits by William May ("May"), a member of the Plaintiff class and former Chairman of the Board of American Can. On the basis of his former position with American Can, May asserts he has "direct personal knowledge" of the intent of the company with regard to its reservation of rights to change Plan

benefits. Affidavit of William May, sworn to 20 November 1992 (the "20 Nov. 1992 May Aff."), ¶ 4. Nevertheless, now that May is a class Plaintiff and has a personal financial stake in the matter, May has presented directly contradictory testimony regarding the intent issue. *See* Affidavit of William May, sworn to 29 September 1987, ¶ 3 (stating that "the Company *always* reserved the legal right to terminate any of the benefits of its retirement program at its sole discretion") (emphasis added); 20 Nov. 1992 May Aff., ¶¶ 3, 5 (stating that "at *no time* did American Can reserve the right to terminate any benefits") (emphasis added). It appears *both* of these affidavits were produced by Plaintiffs' counsel. Opp. Brief at 12.

9. The opinion of the Circuit and this comment in particular were drafted without the benefit of review of Forms A and B, of the two contradictory affidavits by William May and of the two additional contradictory affidavits of Robert Bogart ("Bogart"). *See infra* at p. 1113.

your current medical programs [(the "Current Medical Plan")], both over and under age 65....[10]

Effective January 1, 1993, retirees in the Primerica Group Insurance Plan for Retired Salaried Employees will begin paying premiums to cover 100% of the cost of continuing medical coverage. This decision is in line with Primerica's policy on medical coverage for retirees in those of its subsidiaries that offer continuing coverage.

*Id.* at 1.

The 26 Oct. 1992 Letter estimated the cost of the various program options for retirees as follows. The New Plan, available only to retirees over sixty-five, would cost $50.00 per person per month. *Id.* The CCC/SB plan would cost $296.00 per month to retirees under 65 and $100.00 per month to retirees sixty-five and over. *Id.* The cost of maintaining the Current Medical Plan would be $326.00 per month to retirees under sixty-five and $144.00 per month to retirees sixty-five and over. *Id.* The 26 Oct. 1992 Letter also recognized that "[s]ince the premiums for all of these programs are designed to cover 100% of the total cost, each is subject to increase in the future." *Id.*

Finally, the 26 Oct. 1992 Letter indicated that a number of additional benefits would be eliminated. *Id.* at 2. Specifically, Primerica informed its retirees in the 26 Oct. 1992 Letter that (1) the practice of "reimburs[ing] certain retirees for part of the cost of Medicare Part B" and (2) all "retiree life insurance coverage" would be eliminated, effective 1 January 1993. *Id.*

On 2 December 1992, Primerica sent a follow-up letter to Plaintiffs further explaining the Plan changes. *See* Letter from O'Reilly, dated 2 December 1992 (the "2 Dec. 1992 Letter"), at 1–3. The cost to Plaintiffs of the various medical benefits options remained unchanged from the 26 Oct. 1992 Letter. *See* 2 Dec. 1992 Letter at 1–2. However, the 2 Dec. 1992 Letter further indicated that Plaintiffs'

election to continue medical coverage through Primerica after 1992 [had to be] received ... by the close of business,

Wednesday, December 23, 1992. If no election [was] received by that deadline, it [would be] assumed that [the individual] wish[ed] to discontinue [his/her] medical coverage and the coverage of any enrolled, eligible dependant effective 31 January 1991.

*Id.* at 4. The 2 Dec. 1992 Letter also warned that once a retiree chose to discontinue his or her medical coverage through Primerica, that retiree could not re-enroll in the Plan in the future. *Id.* at 2–4. Finally, the 2 Dec. 1992 Letter stated: "Primerica continues to reserve the right to change or discontinue the medical coverage it sponsors for retirees at any time." *Id.* at 5.

With regard to life insurance, the 2 Dec. 1992 Letter explained that, even though life insurance coverage was to terminate on 31 December 1992, the beneficiary of a Plaintiff who died prior to 31 January 1993 would still "be entitled to receive [the] basic and supplemental death benefit as if [the] coverage had not been terminated." *Id.* at 4. Moreover, the 2 Dec. 1992 Letter indicated that a "conversion policy" would be issued to Plaintiffs who were former recipients of the Plan's life insurance policy. *Id.* at 4–5. Under the conversion policy, an individual life insurance policy would be issued at full cost to the Plaintiffs, effective 1 February 1993. *Id.* Plaintiffs were required to apply for and pay the first premium of this new life insurance by 31 January 1993. *Id.* at 5.

### E. *The Preliminary Injunction Motion*

On 1 December 1992, Plaintiffs served on Primerica a preliminary injunction motion (the "Preliminary Injunction Motion"), in accordance with General Rule 12N, Appendix N, General Rules of the District Court for the District of New Jersey (the "Local Rules"). *See Alexander v. Primerica Holdings, Inc.,* 811 F.Supp. 1025, 1032 (D.N.J. 1993). Despite the fact of a delay of fifty-three days from notification in the 8 Oct. 1992 Letter, the Preliminary Injunction Motion sought to enjoin Primerica "from instituting, effecting, or making any change in or

---

**10.** Comparative summaries of the three plans were provided with the 26 Oct. 1992 Letter. *See* *id.* at 3–4.

to the [Plan] or to the medical health and life insurance benefits that are presently being provided by [D]efendants to [P]laintiffs." *Id.* Plaintiffs' motion was accompanied by a lengthy memorandum and twenty-eight fact intensive affidavits [11] which included eighteen hardship affidavits (the "Hardship Affidavits").[12] *Id.*

Unable to agree on a schedule for the motion (the "Preliminary Injunction Schedule"), the parties appeared for a conference on 8 December 1992. *Id.* At the conference, Plaintiffs requested (1) Primerica be given one week, until 15 December 1992, to file opposition to their voluminous motion, (2) Plaintiffs be given until 16 December 1992 to submit reply papers and (3) a decision from the court with regard to the Preliminary Injunction Motion be issued by 23 December 1992.[13] *Id.* Primerica requested time to depose those retirees submitting affidavits with regard to the Preliminary Injunction Motion. *Id.*

After hearing the arguments presented by the parties, the expedited hearing, as requested, was denied and a modified expedited schedule was set for a decision on the Preliminary Injunction Motion. *Id.* Primerica was ordered to submit opposition by 8 January 1993. *Id.* Reply papers were to be submitted by 12 January 1993. *Id.* In addition, Primerica was permitted to depose the twenty-eight affiants, as requested. *Id.*

Because Plaintiffs' requested motion schedule was not adopted, on 9 December 1992, Plaintiffs filed an emergency appeal with the Third Circuit, pursuant to 28 U.S.C. § 1292(a)(1). *Id.* In the alternative, Plaintiffs sought a writ of mandamus pursuant to 28 U.S.C. § 1651 to direct the court to hear the Preliminary Injunction Motion prior to 23 December 1992. *Id.* On 16 December

1992, the Circuit denied the writ of mandamus and dismissed the appeal. *See id.; see also* Circuit Orders, filed 16 December 1992.

Following all of this, the parties requested a decision on whether a bond would be required as security and, if so, in what amount, should the Preliminary Injunction Motion be granted following argument. *See Alexander,* 811 F.Supp. at 1032. Despite Circuit law indicating that a security bond was required when a preliminary injunction motion was granted, *see id.* at 1034–38, Plaintiffs' initial Preliminary Injunction Motion papers did not address the bond issue. Incredibly, after insisting upon an expedited briefing schedule and an expedited decision on the Preliminary Injunction Schedule, and after requiring the Circuit to address their emergent appeal and application for a writ of mandamus for an expedited decision, Plaintiffs conceded:

> [P]laintiff class here does not have the financial ability to post a bond in any significant amount. . . . In reality, if the Court orders the posting of a bond, other than a very minimal one, as a condition to proceeding, the [P]laintiffs will be unable to comply. . . . If the Court rules that the posting of a significant bond is a prerequisite to the relief sought, the parties concur that there is nothing to be gained at this juncture by depleting [P]laintiffs' resources in preparing for and litigating the issues of likelihood of success on the merits and irreparable harm.

*Id.* at 1032–33.

It was determined that, should the Preliminary Injunction Motion be granted, Plaintiffs would be required to post a bond in the minimum amount of $7,733,514.[14] *See id.* at 1033–39. Plaintiffs then withdrew the Preliminary Injunction Motion, eliminating the

---

11. Counsel for Plaintiffs conceded the twenty-eight affidavits were fact-intensive. *Alexander,* 811 F.Supp. at 1032.

12. In support of the Preliminary Injunction Motion, Plaintiffs submitted eighteen Hardship Affidavits from members of the class which detailed the alleged effect the changes will have on individual class members. *Alexander,* 811 F.Supp. at 1032 n. 14.

13. Plaintiffs indicated an emergency existed and insisted that this drastically expedited schedule

was necessary to prevent "irreparable injury" to the Plaintiff class. *See infra* at p. 1119 (quoting language used by Plaintiffs).

14. The amount of the bond represented the cost to Primerica of maintaining its former level of benefits for a period of eighteen months. *Alexander,* 811 F.Supp. at 1033 & n. 16. Eighteen months was estimated to be the length of time necessary to reach and complete trial and, if Primerica won at trial, for the appellate process to run its course. *Id.*

need for a decision on the merits of the motion. *See* Letter from Towey, dated 14 January 1993, at 1. Instead, Plaintiffs requested the Preliminary Injunction Motion be consolidated with a full trial on the merits; they sought an expedited scheduling for such a trial. *See* Letter Memorandum of Plaintiffs, dated 30 December 1992, at 4-5; Kurzweil Aff., ¶ 15. Accordingly, trial was scheduled for May 1993. *See* Transcript of Proceedings, dated 19 Jan. 1993, at 18.

### F. The Motion To Strike Plaintiffs' Jury Demand

In a status conference on 24 September 1992, Primerica raised the issue of moving to strike Plaintiffs' demand for a jury trial. *See* Transcript of Proceedings, dated 22 Sept. 1992 (the "22 Sept. 1992 Tr."), at 24. At that time, the court indicated this did not appear to be a proper case for a jury trial. *Id.* Counsel for Plaintiffs, Gerald A. Liloia ("Liloia"), concurred in this initial assessment, although he reserved the right to "check the case law." *Id.* The parties were expressly advised that, regardless of the position they ultimately took on the issue, that position should be taken in good faith. *Id.* at 27. Subsequently, Plaintiffs refused to withdraw their demand for a jury.

In February 1993, because Plaintiffs had not, and would not withdraw their demand for a jury, Primerica moved to strike Plaintiffs' jury demand. In an Opinion and Order, filed 25 February 1993 (the "25 Feb. 1993 Decision"), 819 F.Supp. 1296 (1993), the motion to strike was granted. *See id.* at 1299. In addition, given the baseless nature of Plaintiffs' position, costs and fees in bringing the motion were granted to Primerica. *Id.* at 1311-12. The 25 Feb. 1993 Decision stated:

> This motion is not close on the merits. Third Circuit law on the unavailability of a jury trial in ERISA Section 502 actions, such as those alleged here, has been unwavering and clear. Although Plaintiffs have taken the position that "the law is evolving" in the area of jury trials in ERISA action and have relied upon the Supreme Court's decision in *Firestone* [*Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989) ] ... this position is untenable. Since *Fire-*

*stone* was decided the Third Circuit—fully cognizant of the *Firestone* decision—has continued to apply the rule of no jury trial under ERISA section 502 in the aftermath of *Firestone.*

Plaintiffs' argument in support of their demand for a jury trial is baseless and has been made in bad faith. Not only was the law on this issue clear and consistent, but Plaintiffs have not made a good faith argument either that the law has or should be changed. In fact, prior to requiring Primerica to bring this motion to strike, counsel for Plaintiffs initially recognized on the record that it appeared a jury trial was not appropriate in this case. 22 Sept. 1992 Tr. at 24-26. Moreover, counsel for Plaintiffs was cautioned on the record, specifically with regard to this issue of a jury trial, that the court did not believe a jury trial was appropriate in this case and that sanctions would be granted for any litigation activity resulting from conduct lacking good faith. *Id.* at 27. Counsel for Plaintiffs hav[e] failed to heed these warnings, as well as their own initial observation on the issue.

25 Feb 1993 Dec. at 1311-12. It was also noted that (1) Plaintiffs "could have reserved the issue for appeal simply by asking the court, on the record, to rule on the request for a jury trial without the need for a motion to strike by Primerica," and (2) "after review of Primerica's Moving Brief, the baselessness of Plaintiffs' claim to a jury trial was obvious [and] Plaintiffs should have then sought to preserve the issue for appeal rather than requiring further briefing by vigorously opposing the motion." *Id.* at 1312 n. 22.

### G. Current Status of This Litigation

Since remand, it appears the parties have conducted extensive discovery. For instance, Primerica states:

> Primerica has produced thousands of documents, all of which had to be reviewed and analyzed by Dewey Ballantine. In addition, Dewey Ballantine has taken twenty depositions of Plaintiffs' fact witnesses and preliminary depositions of Plaintiffs' two expert witnesses. The parties have each served and responded to interrogatories and Plaintiffs have served a second set of interrogatories and five separate requests

for production. Primerica has sought production of documents from each deponent—and received some of those documents—and has served expert interrogatories on Plaintiffs.

Opp. Brief at 5. While Plaintiffs do not dispute that substantial discovery has taken place, they state that "substantial outstanding discovery remains to be completed prior to trial." Moving Brief at 6. Among this allegedly outstanding .discovery are "depositions of all [D]efendants' trial witnesses, the remaining depositions of [P]laintiffs' forty-two trial witness, production of experts' reports by plaintiffs and defendants; the depositions of experts and the production of documents." *Id.*

Despite their recognition that there exists outstanding discovery, it appears Plaintiffs have refused to participate in further discovery since mid-January 1993, based upon the premise of bringing this motion to disqualify Dewey Ballantine. According to Primerica, Plaintiffs have "fail[ed] to produce a single witness for deposition since the deposition of Mr. May on January 15 or to produce a single document requested by Primerica." Opp. Brief at 6–7. This reluctance appears to have occurred despite the fact that, on numerous occasions, Plaintiffs requested and were denied a stay of discovery in this case. *See* Letter from Riker Danzig, dated 31 March 1993 (requesting stay of discovery); Letter from Riker Danzig, dated 11 Feb. 1993 (same); Letter from Riker Danzig, dated 14 Jan. 1993 (same); *see also* Letter from Court, dated 2 April 1993 (denying request to stay discovery); Letter from Court, dated 17 Feb. 1993 (same); Docket Sheet, dated 19 Jan. 1993 (oral application by Plaintiffs to stay discovery denied).

### H. *The Motion to Disqualify Dewey Ballantine*

In January 1993, more than *three years after* the commencement of this litigation, and only four months prior to trial, Plaintiffs raised the issue of disqualifying Dewey Bal-

lantine. *See* Transcript of Proceedings, dated 13 January 1993 (the "13 Jan 1993 Tr."), at 1–4; Letter from Robert D. Towey, dated 12 Jan. 1993 (the "12 Jan. 1993 Towey Letter") at 2 (attached as Exhibit K to Kurzweil Aff.). At that time, Plaintiffs objected to the potential testimony of Carole Trencher Ivanick ("Ivanick"), Esq., a partner at Dewey Ballantine, who had been placed on a witness list submitted by Primerica. *See* 12 Jan. 1993 Towey Letter at 2.

Plaintiffs pointed out that Ivanick has "served as outside counsel to American Can and its successor Primerica Corporation and [has] advised the Company regarding its legal obligations under ERISA." *Id.* Plaintiffs then stated:

> The identification of Ms. Ivanick as a witness and her witness summary raises several issues: 1) what specific areas of advice regarding the [Primerica]'s obligations under ERISA will be addressed by Ms. Ivanick's testimony? 2) have the [D]efendants waived the attorney-client privilege? and 3) does Ms. Ivanick's proffered testimony create an impermissible conflict of interest for the Dewey Ballantine firm?

*Id.*

On 13 January 1993, this issue was discussed at a status conference. *See* 13 Jan. 1993 Tr. at 1–4. Later that same day, Dewey Ballantine withdrew its designation of Ivanick as a witness. *See* Letter from Harvey Kurzweil, dated 13 January 1993 ("13 Jan. 1993 Kurzweil Letter") (attached as Exhibit L to Kurzweil Aff.). Dewey Ballantine indicated this action was taken "in order to avoid distraction, and save time and expense, associated with this issue." *Id.* at 1–2; Kurzweil Aff., ¶ 19. Dewey Ballantine further explained: "[T]he matters about which Ms. Ivanick would have testified should be undisputed, and we will ask counsel for plaintiffs to stipulate to them. [If] they are unwilling to do so, we will be able to offer other evidence, or substitute another witness as may be appropriate."[15] 13 Jan. 1993 Kurzweil Letter at 1.

---

15. According to Dewey Ballantine, Ivanick would simply have testified as to the occurrence of two factual events—namely, that (1) when new SPDs were printed in 1984, the reservation of rights language was inadvertently dropped and stickers containing the language were printed and physically affixed to the SPDs and (2) in

connection with the sale of American Can's packaging business to Triangle Industries, American Can obtained a contractual agreement from Triangle not to change health benefits for two years. Kurzweil Aff., ¶ 18; Statement of Carole Trencher Ivanick, dated 30 December 1992 (attached as

On 14 January 1993, with the conflict situation apparently resolved, Plaintiffs wrote to Primerica and indicated that the deposition of May, former Chairman of American Can,[16] which was scheduled to occur the following day, would be unilaterally adjourned. *See* Letter from Towey, dated 14 Jan. 1993, at 1 (attached as Exhibit M to Kurzweil Aff.). As a basis for this adjournment, Plaintiffs raised the specter of additional alleged conflicts of interest involving Dewey Ballantine. *Id.* Specifically, Plaintiffs cited: (1) The use of Ivanick as witness, despite the fact that she had already been withdrawn as a witness by Dewey Ballantine, (2) "Dewey Ballantine's involvement as counsel for the Plan and its beneficiaries, and the firm's simultaneous representation of Primerica in a manner that is in direct conflict to the interest of the Plan beneficiaries" and (3) "Dewey Ballantine's personal representation of Mr. May relative to estate planning and other legal matters." *Id.* Despite these contentions, Plaintiffs were directed to proceed, as scheduled, with the May deposition. *See* 14 Jan. 1993 Towey Letter at 3 (confirming direction from court to proceed with discovery).

In March 1993, Plaintiffs formally moved to disqualify Dewey Ballantine. In support of this motion, Plaintiffs make three arguments, only the first two of which had been previously raised. First, Plaintiffs claim Dewey Ballantine has a conflict of interest because May, a member of the Plaintiff class, is also an ongoing client of Dewey Ballantine. *See* Moving Brief at 12–17. Plaintiffs argue Dewey is thus participating in a lawsuit ad-

verse to its client's interests, in violation of Rule 1.7 of the Model Rules of Professional Conduct ("RPC 1.7").[17] Moving Brief at 12–17.

Second, Plaintiffs argue Dewey Ballantine has represented the Annuity Board of American Can and Primerica (the "Annuity Board"), and hence have represented Plaintiffs as the beneficiaries of the Plan. *Id.* at 17–25. Plaintiffs argue this representation violates Rule 1.9 of the Model Rules of Professional Conduct ("RPC 1.9"),[18] because it constitutes an involvement in litigation adverse to a former client's interest, in a matter substantially related to the former representation. Moving Brief at 17–25. Plaintiffs also contend Dewey Ballantine's representation of the Annuity Board appears to be continuing and probably violates RPC 1.7 as well.

Finally, Plaintiffs contend disqualification is mandated, again pursuant to RPC 1.9, because former Dewey Ballantine clients are adverse witnesses to Primerica in the current litigation on matters substantially related to their prior representation. Moving Brief at 26–29. Specifically, Plaintiffs contend that, in *Towey v. Primerica Corp., et al.*, No. 87–2639 (D.N.J.), Robert Bogart ("Bogart") and William Brewster ("Brewster") were named defendants represented by Dewey Ballantine, who now have taken positions adverse to Primerica's position. Because Bogart and Brewster have been listed as witnesses by Plaintiffs, and will be subject to cross-exami-

---

Exhibit J. to Kurzweil Aff.). It appears Plaintiffs have not agreed to stipulate to the occurrence of these events. Opp. Brief at 7.

**16.** May held the position of Chairman of the Board of American Can from 1 August 1965 to 1 November 1980. May Aff., ¶ 1. May is a member of the Plaintiff class and of the "Steering Committee of retirees who organized this litigation." *Id.*, ¶ 2.

**17.** RPC 1.7(a) provides in pertinent part:
A lawyer shall not represent a client if the representation of the client will be directly adverse to the client, unless (1) the lawyer reasonably believes that representation will not adversely the relationship with the other client; and (2) each client consents after a full disclosure of the circumstances and consultation with the client....

*Id.* The position of Plaintiffs is simply that May continues to be a client of Dewey Ballantine, that Dewey Ballantine's representation of Primerica is directly adverse to May and that the firm has not received May's consent to represent Dewey Ballantine in this litigation. Moving Brief at 2, 12–17.

**18.** RPC 1.9(a) provides in pertinent part:
A lawyer who has represented a client in a manner shall not thereafter: (1) represent another client in the *same or substantially related matter* in which the client's interests are materially adverse to the interests of the former client unless the former client consents after a full disclosure of the circumstances and consultation with the former client.
*Id.* (emphasis added).

nation by Primerica, Plaintiffs argue RPC 1.9 will be violated. Moving Brief at 26–29.

### I. Dewey Ballantine's Representation of William May

Describing Dewey Ballantine's representation of May, Primerica states:

> As the chief Executive Officer of a major corporate client, William May on several occasions since 1966,[19] was advised by Dewey Ballantine on estate planning matters. Such advice related solely to Mr. May's estate and various trusts created by him. Dewey Ballantine never advised Mr. May on his medical and life insurance benefits or the company's right to change those benefits.

Opp. Brief at 8–9 (citations omitted).

In listing Dewey Ballantine's alleged contacts with May, Plaintiffs concede Dewey Ballantine's representation of May related solely to May's personal trust and estate matters. See Moving Brief at 13–15; Reply Brief at 3; see also May Aff., ¶ 4. Specifically, Dewey Ballantine appears to have performed the following legal services for May: (1) in 1966, 1969, 1973, 1976, 1982 and 1988, Dewey Ballantine prepared wills and/or codicils for May and his wife; (2) in 1966 and 1978, Dewey Ballantine prepared trusts for May and his wife; (3) Dewey Ballantine filed real estate deeds for May; (4) Dewey Ballan-

tine discussed May's personal, financial and tax-related information in connection with the afore-mentioned trust and estate matters.[20] Moving Brief at 13–14; May Aff., ¶¶ 5, 7; Warren Aff., ¶¶ 3–5. Until recently, Dewey Ballantine remained in possession of the latest draft of May's will. May Aff., ¶ 11.

Following Dewey Ballantine's last drafting of May's will in 1988, May had only two brief contacts with Dewey Ballantine.[21] In May 1990, after filing of this suit but prior to May's becoming a party to this action by virtue of class certification, May requested from Dewey Ballantine a form power of attorney. Id., ¶ 6. Dewey Ballantine did not bill May for the form. Id. Subsequently, on 10 December 1992,[22] May called William B. Warren ("Warren"), a Dewey Ballantine partner who had previously advised May on trust and estate matters.[23] Id. Warren describes this phone call as follows:

> Mr. May told me that he had heard that there might be a change in the exemption amount in gift tax from $600,000 to $300,000 and stated that he was considering making a gift of $300,000 to his daughter. Mr. May also stated he wanted to accomplish this gift by deeding his home to his daughter.
>
> I explained the exemption requirements and my view on a possible change. Mr.

---

**19.** May contends his representation by Dewey Ballantine began in 1959. May Aff., ¶¶ 4–5, 14. It appears, however, that May's 1959 will was prepared by the law firm of Covington & Burling and was only filed with Dewey Ballantine in connection with the re-drafting of May's will in 1966. Warren Aff., ¶¶ 3–4; see also Towey Aff., Ex. A (index of documents in May's files at Dewey Ballantine, indicating that first correspondence between May and firm occurred in 1966). May does not state what, if any, specific acts were performed by Dewey Ballantine prior to 1966.

**20.** Plaintiffs argue Dewey Ballantine advised May on the "very life insurance at issue in this case." Moving Brief at 14. Dewey Ballantine denies this, stating:

> The insurance trust that [Dewey Ballantine] prepared for Mr. May in 1966 was to receive ... upon his death, the proceeds of life insurance policies designated by him. The source of these policies, and the question of whether any of them could be terminated by the grantor (if that grantor was someone other than Mr. May), were not matters as to which Dewey

Ballantine was consulted. Specifically, [Dewey Ballantine] was never consulted, and never rendered advice regarding, American Can Company's right to amend, modify or terminate any life insurance benefits it provided to Mr. May. Warren Aff., ¶ 8. This statement is *not disputed by an affidavit or other sworn statement from Plaintiffs or from May.*

**21.** Despite the infrequency of his contacts with Dewey Ballantine since 1988, May indicates he still considers his attorney-client relationship with the firm to be intact. May Aff., ¶ 4.

**22.** Prior to this phone call from May, there had been *no communication with May for two and one half years.* Warren Aff., ¶ 9. Primerica suggests it is more than coincidence that May's phone call to Warren occurred on 10 December 1992—the day May was first scheduled to be deposed in this case. Opp. Brief at 9.

**23.** It neither appears nor is it alleged that Warren has any connection with the representation of Primerica in this litigation.

May then asked me whether he should take out a $300,000 loan and make a cash gift of it to his daughter. I said this would be a satisfactory plan.

*At the conclusion of the telephone call, Mr. May remarked to me that it was too bad he was on the other side of a litigation from Dewey Ballantine....*

Immediately after hanging up, I remembered that Mr. May lived in Connecticut and that there were state tax issues which might be involved. *I called Mr. May to tell him that he should seek advice with respect to such issues.*

Warren Aff., ¶¶ 10–13 (emphasis added); *see also* May Aff., ¶ 10.

Computer printout records from Dewey Ballantine indicate the first telephone call with May on 10 December 1992 lasted only four minutes and fifty-six seconds. *See* Warren Aff., Exs. B & C. The second phone call with May on 10 December 1992 lasted only ten seconds. *Id.* Warren did not charge any time for these phone calls nor was May billed for any of this alleged advice. *Id.*, ¶ 13. In fact, over the entire life of Dewey Ballantine's allegedly extensive relationship with May, May was billed a total of $473.95. *Id.*, ¶ 5 & Ex. A. The last billing to May was rendered on 13 March 1978, in the amount of $150. *Id.*

### J. Dewey Ballantine's Alleged Representation of the Annuity Board

Dewey Ballantine has served as counsel to American Can, and now to Primerica, since the 1950s, "providing corporate, litigation and tax advice" to the companies. Opp.Brief at 14; May Aff., ¶ 3. In 1974, Dewey Ballantine attorney Ivanick began advising American Can with respect to pension benefits [24] and, until 1988, Dewey Ballantine did the legal work for American Can/Primerica on the company's pension and benefits plans. Ivanick Aff., ¶¶ 3–4. Since 1988, Primerica's pension and benefits legal work has been performed by other law firms and by in-house counsel, with the exception of this litigation. *Id.*, ¶ 4.

Plaintiffs suggest that Dewey Ballantine, particularly Ivanick, provided advice to Annuity Board relating to the company's "retirement plan." [25] Moving Brief at 8–9; Statement of Barbara Kessler (submitted as Exhibit D to Towey Aff.), ¶ 4; Carlin Aff., ¶ 2–3; Giudice Aff., ¶ 2; Ecker Aff., ¶¶ 2–3. Plaintiffs contend Ivanick attended one or more meetings of the Annuity Board and rendered legal advice to the Board members "to assure that the Board was acting within its fiduciary duties." Carlin Aff., ¶ 3; Giudice Aff., ¶ 4; Ecker Aff., ¶ 3.

Ivanick indicates she did advise members of the Annuity Board with respect to "the scope of their fiduciary obligations as members of the [Annuity] Board," but this advice only "involved their general obligations under ERISA." *Id.*, ¶ 6. Moreover, according to Ivanick, American ·Can. and Primerica maintained two distinct types of "retirement" plans—one related to pensions (the "Pension Plan") and one related to employee welfare benefits (the "Welfare Benefits Plan"). *Id.*, ¶ 5. The two plans are separate and are embodied in separate plan documents. *Id.* The Plan specifically involved in this litigation is a Welfare Benefits Plan.

Ivanick suggests Plaintiffs are confusing the Pension Plan and the Welfare Benefits Plan. According to Ivanick, based upon a review of "all [her] time records with respect to the American Can Company," *id.*, ¶ 4, her advice to American Can/Primerica primarily concerned the company's Pension Plans, rather than the Welfare Benefits Plans. *Id.*, ¶¶ 5–7. Ivanick further states:

My role in providing services regarding the [W]elfare [B]enefits [Plan] was a limited one and included occasional advice concerning the filing of forms with the Internal Revenue Service or the Department of Labor, advice on the divestiture of sectors of the Company, advice on the creation of the trusts through which certain welfare benefits were funded, advice on the application of the Internal Revenue Code's nondiscrimination requirements to welfare

---

24. Ivanick began practicing in the employee benefits area at Dewey Ballantine in 1967. Ivanick Aff., ¶ 2.

25. The Annuity Board administered all of the company's retirement and benefit plans, including those for salaried and hourly employees, union and non-union employees, and active and retired employees. Opp. Brief at 14.

plans and advice relating to the effects of COBRA legislation.

*Id.,* ¶ 7.

Despite Ivanick's description of the advice which she rendered to American Can and Primerica, Plaintiffs contend Ivanick, at the request of Brewster[26] and the Annuity Board, drafted and advised the Board of the reservation of rights language contained in the SPDs.[27] Moving Brief at 8–9; Brewster Aff., ¶¶ 3–4; *see also supra* at p. 6 (quoting reservation of rights language). Brewster states:

> I specifically recall seeking legal advice from Carole Trencher [Ivanick] with regard to reservation of rights language in the SPDs. I sought this advice as a member of the Annuity Board. I told [Ivanick] that consistent with the decision made by American Can, it was the Annuity Board's intention to include a clause in the SPDs that only reserved the right to reduce or terminate benefits as required by changes in the law. [Ivanick] advised me that she would provide language for the SPDs that would reserve for the company only this limited right. . . .

Brewster Aff., ¶ 4.

To this contention, Ivanick responds: "Neither Mr. Brewster nor anyone else at American Can ever requested that I draft or revise, in whole or in part, the reservation of rights language. . . . I never provided advice to Mr. Brewster regarding that language, or its purpose and effect."[28] Ivanick Aff., ¶ 9.

### K. *Prior Litigation in the Towey Case*

Filed originally in July 1987, the *Towey* Case arose out of the sale by American Can of its packaging division to Triangle Industries in 1986. Second Amended Class Action Complaint (the *"Towey* Complaint"), filed 20 January 1988, ¶¶ 34–42 (attached as Exhibit E to Towey Aff.); Kurzweil Aff., ¶ 3. As mentioned previously, American Can was able to procure an agreement with Triangle Industries, whereby Triangle Industries continued to provide the same level of benefits to former American Can employees and retirees as they would have received prior to the sale. *Towey* Complaint, ¶ 39; Ivanick Statement, ¶ 6. Nevertheless, a group of unsatisfied packaging retirees sued, alleging that American Can did not have the legal right to change their benefits and could not convey that right in the sale to Triangle Industries.[29] *Towey* Complaint, ¶¶ 23–24; Kurzweil Aff., ¶ 3.

Named as defendants in the *Towey* case were, *inter alia,* Primerica, American Can, Triangle Industries, the Annuity Board, the individual members of the Annuity Board and individual officers and directors. *See Towey* Complaint, ¶¶ 4–19. Among the more than thirty individual defendants named were Bogart and Brewster, as well as numerous members of the Plaintiff class in the present case, including Sal Giudice ("Giudice"), William Carlin ("Carlin"), Eugene Ecker ("Ecker") and C. Richard Pedersen ("Pedersen"). *Towey* Complaint, ¶¶ 9, 14; Opp.Brief at 17.

Dewey Ballantine,[30] along with a New Jersey law firm, Pitney, Hardin, Kipp & Szuch,

---

**26.** Brewster is not a member of the Plaintiff class in this litigation. *See* Reply Brief at 10.

**27.** It appears Brewster was responsible for promulgating American Can's SPDs from 1971 to 1975. Brewster Aff., ¶ 2.

**28.** In fact, it seems questionable as to whether Ivanick drafted the reservation of rights language. This language appeared in an SPD of American Can as early as 1960, while Ivanick did not even begin practicing law until 1962. *See* Pultman Aff., ¶ 4 & Ex. B (copy of 1960 SPD); Ivanick Aff., ¶ 2.

**29.** Plaintiffs concede the issues involved in the *Towey* litigation were almost identical to those in the case *sub judice.* Moving Brief at 9. Both cases involved the same Plan, Plan documents

and reservation of rights language. *Id.* While plaintiffs in the *Towey* Case argued that the reservation of rights language allowed Primerica to change retiree benefits only when mandated by law or required by financial necessity, Plaintiffs in this case argue that modification is appropriate only when mandated by law. *See* Kurzweil Aff., ¶ 6. Primerica maintains the same position in both litigations—namely, that it always reserved the right to change retiree welfare benefits. *Id.,* ¶ 12.

**30.** Dewey Ballantine's litigation team in the *Towey* Case was headed by Harvey Kurzweil, Esq. ("Kurzweil"), the same attorney who now is the senior Dewey Ballantine lawyer responsible for this litigation. Kurzweil Aff., ¶¶ 2, 12. As well, Dewey Ballantine has represented Primerica in this litigation since its inception. *Id.,* ¶ 11.

represented Primerica and American Can, as well as those individual defendants who were former or then present officers and/or directors of the companies. Kurzweil Aff., ¶¶ 4, 5; Brewster Aff., ¶ 6; Bogart Aff., ¶ 3. However, Dewey Ballantine states:

> [It] was retained by Primerica and the Company directed the decisions of the litigation.... The individual defendants played no role in the direction of the litigation and bore no financial burden for the action or for the ultimate settlement of the case.

Kurzweil Aff., ¶ 9. As for plaintiffs in the *Dewey* Case, representation was provided by Riker, Danzig, Scherer, Hyland & Perretti ("Riker Danzig"), the same firm which represents Plaintiffs in the current action.[31] *Id.,* ¶ 4.

Although the *Towey* case was settled in June 1989, substantial litigation and motion activity took place including, *inter alia,* a motion to amend the complaint, certification of a plaintiff class, a motion to file a second amended complaint, a motion by Primerica for dismissal of the second amended complaint, a cross-motion by plaintiffs for summary judgment, a motion to modify class certification, formation of a settlement committee, negotiation of a settlement agreement, and a motion to clarify the settlement agreement. *See* Civil Docket Sheet, *Towey, et al. v. Primerica, et al.,* No. 87–2639.

As part of the proceedings in the *Towey* case, defendant Bogart submitted an affidavit which stated:

> [T]he American Can Group Insurance Plan documents and [SPDs] have *always* reserved in writing the right to modify the welfare benefits for salaried retirees, subject only to applicable law.

Affidavit of Robert B. Bogart, sworn to 24 March 1988 (the "24 March 1988 Bogart Aff."), ¶ 8 (emphasis added) (attached as Exhibit B to Kurzweil Aff.); *see also* Bogart Aff., ¶ 4. The Bogart Aff. was drafted by Dewey Ballantine based upon conversations with Bogart, and was reviewed and revised by Bogart for accuracy. Kurzweil Aff., ¶ 8 &

Ex. C (letter from Kurzweil to Bogart, dated 24 March 1988); Bogart Aff., ¶ 3.

Despite signing the 24 March 1988 Bogart Aff., Bogart now claims:

> The Affidavit that I signed in 1988 does not reflect my understanding of the intent of American Can Company with regard to the proper interpretation of the [SPDs] and the welfare benefits at issue.

Bogart Aff., ¶ 4. In other words, Bogart has now changed his position on the meaning of the reservation of rights language in the SPDs.[32] Bogart has refused to sign an affidavit in this litigation containing language similar to the 24 March 1988 Bogart Aff. *See* Bogart Aff., ¶ 5. In addition, at a deposition taken on 17 December 1992, Bogart provided testimony contrary to the 24 March 1988 Bogart Aff. *See* Bogart Aff., ¶ 6; *see also* Deposition of Robert Bogart, dated 17 Dec. 1992, at 43–45, 66, 71–76, 81–82 (attached as Exhibit G to Towey Aff.).

As a result of this change in testimony, Dewey Ballantine has withdrawn Bogart as a witness in the case *sub judice. See* Letter from Dewey Ballantine, dated 30 Dec. 1992, at 1 (attached as Exhibit H to Towey Aff.). Bogart and Brewster have now both been designated as trial witnesses by Plaintiffs. Moving Brief at 11; *see also* Plaintiffs' List of Witnesses (attached as Exhibit J to Towey Aff.).

*Discussion*

**A. Standard of Review**

■ Rule 6 of the Local Rules provides that attorneys permitted to practice in this court are governed by the Rules of Professional Conduct of the American Bar Association (the "ABA"), as those rules have been revised by the Supreme Court of New Jersey. *See* Local Rule 6(A). In other words, "the ethical rules and constraints imposed on [F]ederal practitioners in New Jersey are the same as those imposed on New Jersey attorneys generally by the state Supreme

---

**31.** As with Dewey Ballantine, the attorneys involved in the *Towey* Case on behalf of Riker are the same as those in this case—namely, Liloia and Robert D. Towey, Esq. *See* Kurzweil Aff., ¶ 4.

**32.** Bogart is neither a member of the Plaintiff class in this litigation nor a current employee of Primerica. Bogart Aff., ¶ 1.

Court under New Jersey Court Rule 1:14." Comment, Local Rule 6.

On 12 July 1984, the New Jersey Supreme Court adopted an amended version of the ABA's Rules of Professional Conduct. *See Id.* New Jersey Court Rule 1:14 provides: "The Rules of Professional Conduct ..., as amended and supplemented by the [New Jersey] Supreme Court ..., shall govern the conduct of members of the bar ... of this state." *Id.* Accordingly, the ABA Rules of Professional Conduct, as adopted by the New Jersey Supreme Court, will be applied in this case. *See In re Glenn Elec. Sales Corp.*, 99 B.R. 596, 598 (D.N.J.1988) (ABA Rules are applied in reviewing motion to disqualify counsel); *United States v. Walsh*, 699 F.Supp. 469, 472 (D.N.J.1988) (same).

Motions to disqualify are viewed with "disfavor" and disqualification is considered a "drastic measure which courts should hesitate to impose except when absolutely necessary." *Schiessle v. Stephens*, 717 F.2d 417, 420 (7th Cir.1983); *Commonwealth Ins. Co. v. Graphix Hot Line, Inc.*, 808 F.Supp. 1200, 1208 (E.D.Pa.1992); *Bennett Silvershein Assoc. v. Furman*, 776 F.Supp. 800, 802 (S.D.N.Y.1991); *Donohoe v. Consolidated Operating & Production Corp.*, 691 F.Supp. 109, 118 (N.D.Ill.1988); *Hamilton v. Merrill Lynch*, 645 F.Supp. 60, 61 (E.D.Pa.1986); *United States use of Lord Elec. Co. v. Titan Pac. Constr. Corp.*, 637 F.Supp. 1556, 1563 (W.D.Wash.1986); *United States Football League v. National Football League*, 605 F.Supp. 1448, 1452 (S.D.N.Y.1985).

 Although doubts are to be resolved in favor of disqualification, the party seeking disqualification must carry a "heavy burden" and must meet a "high standard of proof" before a lawyer is disqualified. *Evans v. Artek Sys. Corp.*, 715 F.2d 788, 791 (2d Cir. 1983); *Bennett Silvershein*, 776 F.Supp. at 802. Similarly, although a party has no right to specific counsel, *International Business Machines Corp. v. Levin*, 579 F.2d 271, 283 (3d Cir.1978), "a party's choice of counsel is entitled to substantial deference." *Commonwealth Ins.*, 808 F.Supp. at 1208; *Hamilton*, 645 F.Supp. at 61; *Nemours Found. v. Gil-*

bane, Aetna, Federal Ins. Co., 632 F.Supp. 418, 431 (D.Del.1986); *see also United States v. Miller*, 624 F.2d 1198, 1201 (3d Cir.1980) (stating that permitting litigant to retain choice of counsel is important countervailing policy to disqualification).

## B. *Delay of Plaintiffs in Bringing Motion to Disqualify Dewey Ballantine*

 Primerica argues that, given the extensive delay of Plaintiffs in bringing this motion to disqualify Dewey Ballantine, Plaintiffs should be found to have waived such relief. *See* Opp.Brief at 35–39. Primerica argues:

> With full knowledge of every material fact, Plaintiffs waited three years, until Primerica invested hundreds of thousands of dollars in its defense and trial became imminent, before raising the issues raised in this motion. In doing so, Plaintiffs have acted in bad faith and have waived any right to the relief they seek.

*Id.* at 35. Primerica also argues that "it [is] difficult to miss the tactical nature of this motion." *Id.* at 39. Because Plaintiffs did not raise two of the three potential arguments for delay until immediately prior to the May deposition,[33] Primerica contends the motion to disqualify Dewey Ballantine is "a desperate attempt" to obscure May's conflicting testimony and to divert the attention of the court. *Id.; see also supra* n. 8 (discussing conflicting testimony of May).

In opposition, Plaintiffs argue the motion to disqualify Dewey Ballantine "was made as soon as class counsel became aware of the facts which form the basis for the breach of the ethics rules." Reply Brief at 16; *see also* Towey Reply Cert., ¶¶ 1–7. Plaintiffs further argue: "That certain class members may have been aware of some of these facts prior to that time is irrelevant because ... it is not the client's responsibility to recognize a conflict." Reply Brief at 16. Finally, Plaintiffs argue that whether this motion gives them an unfair tactical advantage has no relevance, given Dewey Ballantine's "serious breach of ethical obligations." *Id.* at 17 (quoting *Ransburg Corp. v. Champion Spark*

---

**33.** The third argument for disqualification, relating to the *Towey* Case, appeared for the first time in Plaintiffs' motion papers.

*Plug Co.*, 648 F.Supp. 1040, 1047 (N.D.Ill. 1986)). Plaintiffs' attempts to justify their delay are all without merit.

■ Waiver is a valid basis for the denial of a motion to disqualify. *Commonwealth Ins.*, 808 F.Supp. at 1208; *Zimmerman v. Duggan*, 81 B.R. 296, 300 (E.D.Pa.1987); *INA Underwriters Ins. Co. v. Nalibotsky*, 594 F.Supp. 1199, 1204 (E.D.Pa.1984); *Jackson v. J.C. Penney Co.*, 521 F.Supp. 1032, 1034–35 (N.D.Ga.1981). As the *Commonwealth Ins.* court stated:

> [A] finding [of waiver] is justified ... when a former *client* was concededly aware of the former attorney's representation of an adversary but failed to raise an objection promptly when he had the opportunity. In [this] circumstance, the person whose confidences and secrets are at risk of disclosure or misuse is held to have waived his right to protection from that risk.[34]

808 F.Supp. at 1208 (emphasis added); *see also Trust Corp. of Montana v. Piper Aircraft Corp.*, 701 F.2d 85, 87 (9th Cir.1983) (citing additional cases); *Central Milk Producers Cooperative v. Sentry Food Stores, Inc.*, 573 F.2d 988, 992 (8th Cir.1978); *Zimmerman*, 81 B.R. at 300; *INA Underwriters*, 594 F.Supp. at 1204 (citing additional cases); *Jackson*, 521 F.Supp. at 1034–35.

■ In determining whether the moving party has waived its right to object to the opposing party's counsel, consideration must be given to (1) the length of the delay in bringing the motion to disqualify, (2) when the movant learned of the conflict, (3) whether the movant was represented by counsel during the delay, (4) why the delay occurred and (5) whether disqualification would result

in prejudice to the non-moving party. *Commonwealth Ins.*, 808 F.Supp. at 1208; *Employers Ins. of Wausau v. Albert D. Seeno Constr. Co.*, 692 F.Supp. 1150, 1165 (N.D.Cal. 1988). In particular, consideration should be given and inquiry made as to whether the motion was delayed for tactical reasons. *Central Milk Producers*, 573 F.2d at 992; *Commonwealth Ins.*, 808 F.Supp. at 1208; *Employers Ins.*, 692 F.Supp. at 1165; *Lord Elec.*, 637 F.Supp. at 1563; *Nemours Found.*, 632 F.Supp. at 431; *see also Richardson–Merrell, Inc. v. Koller*, 472 U.S. 424, 436, 105 S.Ct. 2757, 2763, 86 L.Ed.2d 340 (1985) ("We share the ... concern about the 'tactical use of disqualification motions' to harass opposing counsel").

### 1. Delay

In the case *sub judice*, the delay in bringing this motion to disqualify is both substantial and undue. Put simply, all facts which underlie this motion were known to Plaintiffs from the start of this litigation. For instance, with regard to Dewey Ballantine's personal representation of May, it cannot be disputed that May was aware of the alleged conflict of interest from the beginning of this case. Certainly, May was aware of his own representation by Dewey Ballantine. *See* May Aff., ¶¶ 4–11. Moreover, by May's own admission, he (1) is "a member of the Steering Committee of retirees who *organized* this litigation" and (2) is aware that Dewey Ballantine has provided legal services to American Can and Primerica "from at least as early as the 1950s." *Id.*, ¶¶ 2–3 (emphasis added). Thus, it is inconceivable May did not know that Dewey Ballantine represented Primerica in this litigation.[35]

---

**34.** Some courts have framed their analysis of these issues in terms of laches or estoppel, rather than waiver, and have denied motions for disqualification which were raised at a late date and where the delay had caused the non-movant to rely upon the representation of counsel sought to be disqualified. *See, e.g., Redd v. Shell Oil Co.*, 518 F.2d 311, 314–15 (10th Cir.1975); *Warpar Mfg. Corp. v. Ashland Oil, Inc.*, 606 F.Supp. 852, 858–59 (N.D.Ohio 1984); *Glover v. Libman*, 578 F.Supp. 748, 767 (N.D.Ga.1983); *United States v. Newman*, 534 F.Supp. 1113, 1127 (S.D.N.Y. 1982). For the purposes of this motion, this is a distinction without a difference—both waiver and estoppel dictate that the motion to disqualify Dewey Ballantine be denied.

**35.** May states in reply that "when [he] called Mr. Warren, [he] was unaware that it was a conflict of interest for one lawyer in a law firm to represent [him] while another lawyer in a different department of the firm was adverse to me." May Reply Cert., ¶ 4. This comment is both implausible and inconsistent with the record. May was Chairman of the Board of Primerica and was and is a sophisticated businessman. With this background, it is inconceivable that May did not know that a law firm could not represent clients on both sides of a litigation. Moreover, May's conversation with Warren—as related by Warren and not contradicted by May—indicates May was keenly aware that Dewey Ballantine represented his adversary in this litigation. *See supra* at pp. 1110–11.

Similarly, it cannot be disputed that a number of Plaintiffs were aware of Dewey Ballantine's alleged representation of the Annuity Board since the commencement of the litigation. Ecker, Giudice, Pedersen, Carlin and Alexander were all members of the Annuity Board. All are class Plaintiffs in this litigation and some are members of the Steering Committee. These people concede that they knew from personal experience that Dewey Ballantine provided legal advice to the Annuity Board. *See* Ecker Aff., ¶¶ 1–4; Giudice Aff., ¶¶ 1–4; Carlin Aff., ¶¶ 1–3. In fact, Pedersen, former in-house counsel for Primerica, was intimately involved in the dealings between Dewey Ballantine and the Annuity Board. *See* Giudice Aff., ¶ 3; Ecker Aff., ¶¶ 2–3; Carlin Aff., ¶ 2.

Finally, Plaintiffs cannot disavow knowledge, from the inception of this litigation, of Dewey Ballantine's involvement in the *Towey* Case. Plaintiffs concede they knew Dewey Ballantine has consistently represented American Can and Primerica since the 1950s. *See, e.g.,* May Aff., ¶ 3. Specifically, numerous Plaintiffs in this litigation—including, *inter alia,* Carlin, Ecker, Giudice and Pedersen—were represented by Dewey Ballantine as defendants in the *Towey* Case. *See Towey* Complaint at 1. As well, Dewey Ballantine's representation of Primerica in the *Towey* Case was well known to Riker Danzig, Plaintiffs' current counsel. As in this case, Riker Danzig represented the plaintiff class in the *Towey* Case and opposed Dewey Ballantine. *See supra* at pp. 1112–13.

Despite having the knowledge necessary to discern these conflict of interest issues in December 1989, when this lawsuit was filed, Plaintiffs did not raise these issues or initiate the motion to disqualify Dewey Ballantine until, the earliest, January 1993. In other words, Plaintiffs inexplicably waited until *three years* after filing of this lawsuit and four months prior to trial before seeking to disqualify Dewey Ballantine. Courts have not hesitated to deny motions to disqualify brought after shorter periods of undue delay.

*See, e.g. Commonwealth Ins.,* 808 F.Supp. at 1208–09 (motion to disqualify denied when brought more than two years after filing of complaint and grounds of alleged conflict were known from commencement of suit); *Trust Corp. of Montana,* 701 F.2d at 87–88 (same, delay of two years and six months); *Central Milk Producers,* 573 F.2d at 992 (same, delay of over two years); *Zimmerman,* 81 B.R. at 300–01 (same, delay of almost three years); *Warpar Mfg.,* 606 F.Supp. at 858–59 (same, delay of one year and nine months); *Glover,* 578 F.Supp. at 767 (same, delay of thirteen months); *Jackson,* 521 F.Supp. at 1034–35 (same, delay of fifteen months).

Plaintiffs argue the motion for disqualification was not delayed because Riker Danzig did not know of the operative, underlying facts until December 1992 or January 1993. *See* Towey Reply Cert., ¶¶ 3–4. This argument is unavailing. First, while some of these the facts may not have been known to Riker Danzig, those facts have long been known Riker Danzig's clients. As discussed above, a finding of waiver is justified when a *"client* was concededly aware of the former attorney's representation of an adversary but failed to raise an objection promptly when he had the opportunity." *Commonwealth Ins.,* 808 F.Supp. at 1208 (emphasis added); *see also Trust Corp. of Montana,* 701 F.2d at 87; *Zimmerman,* 81 B.R. at 300; *INA Underwriters,* 594 F.Supp. at 1204 (citing additional cases).

In this case, there is no reason to relieve Plaintiffs of this obligation. Many Plaintiffs, in particular those on the Steering Committee, are sophisticated businessmen.[36] Pedersen is an attorney. As the court recognized in *Glover,* in denying a motion to disqualify, "sophisticated businessmen ... assume[ ] a greater responsibility as a legally informed client." *See* 578 F.Supp. at 758. In fact, even when such sophistication is lacking, waiver has been found when Plaintiffs, early on, could have sought the advice of counsel

---

**36.** For instance, Carlin was the Vice President of the Human Resources Department. Carlin Aff., ¶ 1. Giudice was an Executive Vice President, in charge of Human Resources and Corporate Communications. Giudice Aff., ¶ 1. Ecker was an executive in the Human Resources Department for twenty years and an executive in the Finance Department for twelve years. Ecker Aff., ¶ 1. And, as discussed, May was the Chairman of the Board of American Can from 1965 to 1980. All of these men, moreover, were members of the Annuity Board.

as to potential conflict of interest concerns but failed to do so. *See Commonwealth Ins.,* 808 F.Supp. at 1209. Stated simply, if Dewey Ballantine's representation of May or of the other members of the Annuity Board was as significant as Plaintiffs now argue, it is inconceivable that they would have allowed this litigation to progress for three years, with full knowledge of Dewey Ballantine's role as counsel for Primerica, without mention of the underlying facts to Riker Danzig.[37]

In addition, Riker Danzig overstates its representation of ignorance. Not only was Riker Danzig well aware of Dewey Ballantine's representation of Primerica in the *Towey* Case, it was also aware that a number of the class Plaintiffs and potential witnesses in this action were defendants in the *Towey* Case and were then represented by Dewey Ballantine. Many of these persons were officers and directors of Primerica and/or American Can, as well as members of the Annuity Board. In other words, Riker Danzig knew that many of these persons may have been involved with formulating the policies of Primerica and American Can with regard to its retirement benefits.

Because Riker Danzig also knew that, in this case, a significant legal issue is the intent of Primerica and American Can in formulating and providing retirement benefits, it could easily have anticipated that such persons as May, Giudice, Ecker, Pedersen, Brewster and Bogart would be necessary witnesses—and hence subject to cross-examination by Dewey Ballantine—in this litigation. Thus, to suggest that it was Bogart's conversion from a witness for Primerica to a witness for Plaintiffs that revealed "the magnitude of Dewey's ethical problems," *see* Towey Reply Cert., ¶ 7, is simply disingenuous. By January 1993, Riker Danzig had long been aware of the entire range of potential conflicts involving Plaintiffs who had been defendants in the *Towey* Case. There is no excuse for its failure to raise this issue until now. *See Greater Rockford Energy & Technology Corp. v. Shell Oil Co.,* 777

F.Supp. 690, 694 (C.D.Ill.1991); *Warpar,* 606 F.Supp. at 859.

### 2. *Prejudice to Primerica*

■ A significant factor in the waiver/estoppel analysis is the prejudice which, as result of a substantial delay, would inure to the non-movant if the motion for disqualification is granted. When that prejudice would be great, courts have not granted motions to disqualify. *See, e.g., Central Milk Producers,* 573 F.2d at 992; *Commonwealth Ins.,* 808 F.Supp. at 1209; *Greater Rockford Energy,* 777 F.Supp. at 694; *Sencon Sys., Inc. v. W.R. Bonsal Co.,* No. 85–8250, 1988 WL 9130, *6 (N.D.Ill. 2 Feb. 1988); *Donohoe,* 691 F.Supp. at 119; *Lord Elec. Co.,* 637 F.Supp. at 1563; *Nemours Found.,* 632 F.Supp. at 429–30; *Warpar Mfg.,* 606 F.Supp. at 858; *Zimmerman,* 81 B.R. at 301; *Dewey v. R.J. Reynolds Tobacco Co.,* 109 N.J. 201, 218–19, 536 A.2d 243 (1988).

In this case, Plaintiffs' three year delay in bringing this motion cannot be excused because, at this point, granting the motion would result in extreme and unfair prejudice to Primerica. Since the inception of this case, Dewey Ballantine has handled all aspects of the case for Primerica and has engaged in substantial pre-trial preparation. *See supra* at pp. 1107–08. As a result, Dewey Ballantine has a singular familiarity with the evidence in this case. On behalf of Primerica, Dewey Ballantine has (1) reviewed and produced thousands of documents, (2) taken twenty depositions of Plaintiffs' fact witnesses and preliminary depositions of Plaintiffs' two expert witnesses, (3) served and responded to two sets of interrogatories and five separate requests for document production, (4) sought and, in many cases, received the production of documents from deponents, and (5) served expert interrogatories on Plaintiffs.

Dewey Ballantine, moreover, has singular familiarity with the issues in this case. For instance, on behalf of Primerica, Dewey Ballantine has (1) as mentioned, participated in

---

**37.** For instance, although May states that "[i]t was not until January 1993, during a meeting in anticipation of [his] deposition, that [he] mentioned to Riker Danzig that Dewey Ballantine was his attorney," May Aff., ¶ 13, May clearly was aware of this potential conflict when, in December 1992, he remarked to Dewey Ballantine attorney Warren that "it was too bad he was on the other side of the litigation from Dewey Ballantine." Warren Aff., ¶ 12.

extensive discovery proceedings, (2) successfully moved for summary judgment and argued against reversal of the judgment on appeal, (3) defended against a motion for preliminary injunction and (4) moved to strike Plaintiffs' jury demand. All of this discovery and these motions required Dewey Ballantine to address the merits of this case and, therefore, to become intimately familiar with the legal and factual issues of this case and to apply the evidence culled from discovery to those issues.[38]

Not only has Dewey Ballantine become uniquely acquainted with the relevant facts and legal issues in this case, but the firm itself "has devoted thousands of hours to this litigation and Primerica has invested hundreds of thousands of dollars in its defense." Kurzweil Aff., ¶ 11. Based upon the facts surrounding this motion, all of this preparation, as well as the economic investment, would be unfairly lost to Primerica if Dewey Ballantine were not allowed to continue in this case. *See SWS Financial Fund A v. Salomon Bros. Inc.,* 790 F.Supp. 1392, 1400 (N.D.Ill.1992); *INA Underwriters Ins. Co. v. Rubin,* 635 F.Supp. 1, 6 (E.D.Pa.1983). This is particularly so because Plaintiffs seek not just to disqualify Dewey Ballantine, but also to preclude Dewey Ballantine "from consulting with new counsel and passing on its work product to new counsel." Moving Brief at 40.

Finally, at this late stage in the litigation, it is doubtful that Primerica could find capable substitute counsel without substantial delay. Not only would Primerica be deprived of its chosen counsel which, Plaintiffs concede, has represented the company since the 1950s, but it is unlikely that substitute counsel could timely become acquainted with the facts, discovery and legal issues necessary to provide Primerica with an effective defense. Again, this task is all the more unlikely because, pursuant to Plaintiffs' request, substitute counsel would not have the benefit of Dewey Ballantine's prior work product and would be forced to start from scratch. *See Reynolds,* 109 N.J. at 219, 536 A.2d 243; *see also Freeman v. Chicago Musical Instrument Co.,* 689 F.2d 715, 719–20 (7th Cir.1982)

(court must consider in deciding disqualification motion that it may be "difficult, if not impossible, for a new attorney to master the nuances of the legal and factual matters late in the litigation of a complex case") (citation omitted); *see also Zimmerman,* 81 B.R. at 301 (in denying disqualification motion, court recognized "strong interest" of party "in retaining counsel utilized ... for the last 13 years").

After three years of delay and silence by Plaintiffs, and three years of reliance by Primerica, it would be unfair and incurably prejudicial to (1) deny Primerica the benefit of Dewey Ballantine's extensive and unique experience, (2) deprive Primerica of the substantial financial investment it has made in Dewey Ballantine or (3) require Primerica to obtain new counsel, completely unfamiliar with the morass of facts and legal issues in this case, all at this late stage in the litigation process. *See Central Milk Producers,* 573 F.2d at 992; *Commonwealth Ins.,* 808 F.Supp. at 1209; *Greater Rockford Energy,* 777 F.Supp. at 694; *Sencon Sys.,* 1988 WL 9130 at *6; *Donohoe,* 691 F.Supp. at 119; *Lord Elec. Co.,* 637 F.Supp. at 1563; *Nemours Found.,* 632 F.Supp. at 429–30; *Warpar Mfg.,* 606 F.Supp. at 858.

As the New Jersey Supreme Court stated in *Reynolds,* disqualification at this late stage in the litigation "would do more to erode the confidence of the public in the legal profession and the judicial process than would allowing the firm to continue its representation." 109 N.J. at 219, 536 A.2d 243; *see also Trust Corp. of Montana,* 701 F.2d at 88 (conflict of interest problems should not be delayed and should be raised long before time when disqualification "would cast a shadow over the trial itself").

### 3. *Strategic Purposes of Disqualification Motions*

When a motion to disqualify appears to have been made primarily for strategic purposes or would provide the movant with an undue tactical advantage, courts "have been extremely reluctant to disqualify attorneys." *Nemours Found.,* 632 F.Supp. at 430–31; *see*

---

**38.** Adding to Dewey Ballantine's familiarity with the facts and issues of this case is the fact that Dewey Ballantine represented Primerica in the

*Towey* Case, which involved the same Plan, the same issues and many of the same Plan documents as this litigation. *See supra* at nn. 29–30.

*also Freeman,* 689 F.2d at 722; *Donohoe,* 691 F.Supp. at 119; *Lord Electric,* 637 F.Supp. at 1563; *Glover,* 578 F.Supp. at 769.

This motion has every appearance of a motion brought for the purpose of obtaining an unfair tactical advantage over Primerica. Plaintiffs have waited *three years* to act on information and issues which they have known from the outset and did not raise the issue until four months prior to trial. Plaintiffs have neither suggested nor does the record reveal that even prior to January 1993 did Plaintiffs suggest Dewey Ballantine's representation of Primerica was improper. *See Commonwealth Ins.,* 808 F.Supp. at 1209. Similarly, Plaintiffs and their counsel are well aware of the substantial hardship which would be suffered by Primerica if this motion were granted at this late date in the proceedings. Riker Danzig, like Dewey Ballantine, was involved in the *Towey* Case. Riker Danzig knows Dewey Ballantine and Kurzweil have consistently represented Primerica on these issues since 1987, and can appreciate the substantial loss in experience, investment and effective advocacy that would be lost if Dewey Ballantine were disqualified.

For numerous reasons beyond mere delay, the timing of this motion is suspect. For instance, Plaintiffs have consistently expressed concern at the harm caused by Primerica's recent change in benefits and have repeatedly argued to have this litigation be decided as quickly as possible in order to minimize that harm. Nowhere was this urgency more vehemently expressed than in the recent Preliminary Injunction Motion. Citing eighteen Hardship Affidavits from individual class members, Plaintiffs sought an impossibly expedited schedule for review of the Preliminary Injunction Motion. When they were denied that schedule, Plaintiffs again emphasized their urgency by filing an emergent appeal and a petition for a writ of mandamus with the Circuit to compel this court to adopt its original expedited schedule. Plaintiffs argued in their petition for mandamus:

> [T]he District Court's failure to exercise its duty to decide the preliminary injunction application will cause Plaintiffs to suffer *irreparable injury.* Forestalling a decision on the application will permit [D]efendants to effect a rapid and drastic change in the status quo.... Retirees may be terminated from the Plan; they may be left without medical coverage pending determination of the preliminary injunction motion; they may be compelled to accept substantially reduced medical benefits; and they may be covered by virtually no life insurance.

Brief and Appendix of Plaintiffs–Appellants–Petitioners, On Appeal From and On Petition For Writ of Mandamus, dated 10 Dec. 1992, at 19–20 (emphasis added). As mentioned, the appeal was dismissed; the writ of mandamus was denied. Orders of Third Circuit, filed 16 December 1992.

Now, however, Plaintiffs have lost their sense of urgency and seek to delay a resolution of this case substantially and indefinitely by requiring Primerica to obtain new counsel. As a result of this motion, trial cannot occur in May. This delay is particularly inexplicable given that Plaintiffs have withdrawn their Preliminary Injunction Motion and continue to be subject to Primerica's revised and curtailed benefits Plan.[39] In point of fact, at the time when Plaintiffs withdrew their Preliminary Injunction Motion, they again emphasized the urgent need to resolve this matter. This inconsistency raises serious doubts as to Plaintiffs' motives in bringing this motion.

As well, it has not escaped attention that this motion to disqualify Dewey Ballantine follows upon recent discovery which appears to significantly damage Plaintiffs' case. Specifically, recent depositions conducted by Dewey Ballantine have revealed that two key witnesses for Plaintiffs—May and Bogart—have given inconsistent sworn testimony on the issue of whether Primerica intended to reserve its right to alter or eliminate Plan benefits. *See supra* at p. 1113 & n. 8. These inconsistencies became apparent when current testimony and affidavits by these witnesses was compared to affidavits submitted by them during the *Towey* Case, which affi-

---

**39.** Moreover, despite the fact that this inconsistency was raised in Primerica's opposition papers, *see* Opp. Brief at 39 n. 35, Plaintiffs have chosen not to address the issue in their reply papers.

davits had apparently remained in the possession of Dewey Ballantine.

By requesting that, at this late stage in the litigation, Dewey Ballantine be disqualified and "also be precluded from consulting with new counsel and passing on its work product to new counsel," Moving Brief at 40, Plaintiffs apparently seek to deprive Plaintiffs of the use of Dewey Ballantine's extensive experience, records and files in this matter. To the extent this tactic reflects an attempt to mask what could be perjurious statements by their witnesses or to inhibit the ability of Primerica to fairly oppose Plaintiffs' case, it is inimical to the search for truth in this matter and cannot be condoned. *See SWS Financial*, 790 F.Supp. at 1401 (disparaging tendency of parties to bring disqualification motions to divert attention from merits of case); *Bobbitt v. Victorian House, Inc.*, 545 F.Supp. 1124, 1128 (N.D.Ill.1982) (same). That Plaintiffs have refused to go forward with discovery in this case, despite repeated directions to do so by the court, only adds to the suspicion that this motion has not been brought for proper purposes. *See Lord Electric*, 637 F.Supp. at 1563.

Accordingly, the motion to disqualify Dewey Ballantine is denied. The motion appears to have been filed for the purpose of gaining for Plaintiffs an undeserved tactical advantage over Primerica.[40] Moreover, even if this motion were brought in the best of faith, the unreasonable three year delay in raising these issues, as well as the significant prejudice to Primerica that would follow from the disqualification of Dewey Ballantine, compel denial of the disqualification motion. Simply put, Plaintiffs could have and should have raised these issues at the commencement of this litigation. Because they waited three years to do so, they have waived their opportunity to disqualify Dewey Ballantine; because for three years Primerica has detrimentally relied on Plaintiffs' silence, Plaintiffs are estopped from asserting those grounds for disqualification.[41]

*Conclusion*

For the reasons set forth above, Plaintiffs' motion to disqualify Dewey Ballantine as counsel for Primerica is denied.

---

**40.** This conclusion is consistent with the prior conduct of Plaintiffs and their counsel throughout this litigation—conduct which has been characterized by excessive contentiousness and, at times, bad faith. For instance, as discussed, Plaintiffs filed a mammoth Preliminary Injunction Motion and insisted the court review the merits of that motion on extremely short notice. *See supra* at pp. 1105–07. After taking up significant time of this court, the Circuit and their adversary on the issue of the Preliminary Injunction Schedule, Plaintiffs withdrew the Preliminary Injunction Motion because, essentially, they concede they had failed to adequately consider the standards for issuance of a preliminary injunction. *Id.* Specifically, Plaintiffs had filed to consider that, if successful on the merits of the Preliminary injunction Motion, they would be required to post a bond. *Id.*

Similarly, despite clear indications from the court and significant Circuit authority to the contrary, Plaintiffs insisted on maintaining their right to a jury trial. *See supra* at p. 1107. By maintaining this unfounded position, Plaintiffs forced Primerica to file a motion to strike the jury demand and forced the court to issue a detailed opinion addressing the lack of merit of Plaintiffs' position. *Id.* In fact, this position was so baseless that sanctions were imposed. *Id.*

Finally, also as mentioned, Plaintiffs have apparently refused to go forward with discovery in this case, despite numerous directives from this court that discovery should continue. *See supra* at pp. 1107–08. This motion to disqualify Dewey Ballantine, made after three years of delay and after significant reliance by Primerica has occurred, appears to be simply another link in what appears to be an abusive chain of events.

Discovery is to re-commence. Further delay may be the subject of sanctions.

**41.** Regardless of whether Plaintiffs' motion to disqualify Dewey Ballantine has substantive merit, the reasons discussed herein compel denial of the disqualification motion. Accordingly, the merits of the Plaintiffs' motion are not considered. It is noted, however, that serious problems exist with regard to the substantive arguments posed by Plaintiffs.